**Glenda M. COCANOWER, Plaintiff,**

v.

**Paul N. MARSTON, individually and as Recorder for Maricopa County, Defendant,**

and

**State of Arizona, Intervenor.**

**No. Civ. 70–295 Phx.**

United States District Court,
D. Arizona.

Sept. 21, 1970.

As Amended Sept. 25, 1970.

Before TRASK, Circuit Judge, and MUECKE and COPPLE, District Judges.

### JUDGMENT

COPPLE, District Judge:

Trial herein was held before this Court on August 24, 1970. Evidence was presented by both sides and the matter was taken under advisement.

Plaintiff attacks the constitutionality of Arizona's durational residency requirement for voting in state general elections. The state's constitutional and implementing statutory provisions provide that a prospective registrant must have been a resident of the state one year preceding the election in which he or she seeks to vote.[1] Other than failing to satisfy this one-year requirement, plaintiff is in all respects eligible to register.

Prior to the initiation of this action it was the practice of the defendant county recorder to accept all applications for registration on their face. That is, no attempt was made to verify or investigate representations made on the county's registration form. In accordance

Lewis & Roca, by John P. Frank, J. David Rich, Phoenix, Ariz., for plaintiff.

Albert I. Firestein, Deputy County Atty., Phoenix, Ariz., for defendant.

John McGowan, Deputy Atty. Gen., Phoenix, Ariz., for intervenor.

1. Ariz.Const. Art. 7 § 2 (Supp.1969–70), provides in pertinent part:

No person shall be entitled to vote at any general election, or for any office that now is, or hereafter may be, elective by the people, or upon any question which may be submitted to a vote of the people, unless such person be a citizen of the United States of the age of twenty-one years or over, and shall have resided in the State one year immediately preceding such election, provided that qualifications for voters at a general election for the purpose of electing presidential electors shall be as prescribed by law. The word "citizen" shall include persons of the male and female sex.

Ariz.Rev.Stat.Ann. § 16–101 (1956) reads in pertinent part:

A. Every resident of the state is qualified to become an elector and may register to vote at all elections authorized by law if he:

\* \* \* \* \*

3. Will have been a resident of the state one year and of the county and pre-

cinct in which he claims the right to vote thirty days next preceding the election.

Ariz.Rev.Stat.Ann. § 16–143 (Supp. 1969–70) reads in pertinent part:

A. The form used for the registration of electors shall contain:

\* \* \* \* \*

13. A statement that the applicant has resided in the state for a period of one year next preceding the general election, and in the county and precinct thirty days preceding the election.

B. The affidavit of registration shall be in substantially the following form:

AFFIDAVIT OF REGISTRATION

State of Arizona }
County of _____ } ss.:

I, the undersigned elector, do solemnly swear (or affirm) that I am a citizen of the United States and will have resided in the state of Arizona one (1) year prior to the next general election.

\* \* \*

with such procedure plaintiff's application, on which she indicated she had not resided in the state one year, was rejected by the defendant.

It is plaintiff's contention that Ariz. Const. Art. 7 § 2 (Supp.1969–70), Ariz. Rev.Stat.Ann. § 16–101, subsec. A, par. 3 (1956) and Ariz.Rev.Stat.Ann. § 16–143, subsecs. A, par. 13, B (Supp.1969–70), on their face and as applied, violate the Equal Protection Clause, U.S.Const. Amend. XIV. Specifically, it is alleged that Arizona is neither promoting a compelling state interest nor maintaining a reasonable classification by imposing the precondition of one-year residence on exercise of the franchise. Likewise, because it also prevents her from voting for candidates for the offices of United States Senator and United States Representative, plaintiff argues that Arizona's residency requirement is violative of both the Equal Protection and Privileges and Immunities Clauses, U.S.Const. Amend. XIV. Plaintiff further contends that the one-year requirement abridges her civil right to travel under U.S.Const. Amend. XIV and denies her due process of law guaranteed by U.S.Const. Amends. V and XIV.

In seeking declaratory and injunctive relief, along with an unspecified amount of monetary damages, jurisdiction is invoked under 28 U.S.C. §§ 2201, 2202, 2281, 2284; 28 U.S.C. § 1343 and 42 U.S. C. § 1983.

## EQUAL PROTECTION CLAUSE

Putting aside for a moment consideration of Arizona's residency requirement insofar as it imposes a prerequisite for voting for the offices of United States Senator and Representative, it must first be determined which Fourteenth Amendment standard is to be applied in testing the constitutionality of state general election residency requirements. Contrary to what plaintiff suggests, there is authority to indicate that the compelling state interest test is not the applicable standard and that the Equal Protection Clause does not yet demand aboli-

tion of such state residency requirements.

The Supreme Court has applied the compelling state interest test in a trilogy of special purpose election cases. Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); City of Phoenix, Arizona v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970). However, in each case state legislation had the effect of completely denying the franchise to one or more classes of interested citizens on grounds *other than* age and residence. As the Court in *Kramer* clearly noted:

At the outset, it is important to note what is *not* at issue in this case. * * Appellant agrees that the States have the power to impose reasonable citizenship, age, and residency requirements on the availability of the ballot. The sole issue in this case is whether the *additional* requirements of § 2012 —requirements which prohibit some district residents who are otherwise qualified by age and citizenship from participating in district meetings and school board elections—violate the Fourteenth Amendment's command that no State shall deny persons equal protection of the laws. 395 U.S. at 625–626, 89 S.Ct. at 1888–1889 (citations omitted).

In distinguishing the compelling state interest test from the "rational basis" standard and in further emphasizing the limits of its holding, the Court in *Kramer* went on to say:

Therefore, if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest.

And, for these reasons, the deference usually given to the judgment of legislators does not extend to decisions concerning which resident citizens

may participate in the election of legislators and other public officials. * * * Accordingly, when we are reviewing statutes which deny some residents the right to vote, the general presumption of constitutionality afforded state statutes and the traditional approval given state classifications if the Court can conceive of a "rational basis" for the distinctions made are not applicable. 395 U.S. at 627–628, 89 S.Ct. at 1889–1890 (citations omitted).

Two other cases demonstrate the changing nature of the legal reasoning employed to invalidate certain discriminatory state voter-qualification legislation.

The pre-Kramer decision, Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965), did not involve a durational residency requirement. Rather, the State of Texas had a unique constitutional provision which prevented a soldier living in the state from ever controverting the presumption of non-residence. It was this inability to ever establish the fact of residence which the Court found amounted to invidious discrimination. 380 U.S. at 96, 85 S.Ct. at 780. There is little question that in Carrington the Court was applying a "reasonableness" standard and that under such measure a state still has considerable leeway in imposing residency requirements for state elections.

Texas has the unquestioned power to impose reasonable residence restrictions on the availability of the ballot. There can be no doubt either of the historic function of the States to establish, on a nondiscriminatory basis, and in accordance with the Constitution, other qualifications for exercise of the franchise. 380 U.S. at 91, 85 S.Ct. at 777 (citations omitted).

In a very recent opinion authored by Mr. Justice Marshall, Evans v. Cornman, 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970), the Supreme Court struck down a Maryland requirement which prohibited persons living on a federal enclave within Maryland from voting in state elections. Entwined in the problems of federalism were issues strikingly similar to those in Carrington. That is, by whatever rationale, state citizens were being conclusively excluded from the franchise. What is important about Evans is that the Fourteenth Amendment standard applied in striking down the state election rule was the compelling state interest test. Again, however, as in Carrington, permanent exclusion was at issue, not exclusion for a limited durational period.

Thus, although recognizing that a certain amount of ambiguity and inaccuracy is inherent in the practice of tagging constitutional doctrines with labels, whether the rule be phrased to the effect that the compelling state interest test has been thus far applied only to cases of permanent exclusion and limited special purpose elections, or that residence requirements for state general elections need only be based on a constitutionally permissive and reasonable state purpose, the result is the same—the states may still impose durational residency requirements for voting in their general elections.

As early as 1904 in Pope v. Williams, 193 U.S. 621, 24 S.Ct. 573, 48 L.Ed. 817, the Supreme Court upheld a Maryland state election law which required the prospective voter to register with the clerk of the court, indicating an intent to become a resident of the state. In a decision based largely on the Privileges and Immunities Clause,[2] the Court noted

---

2. The privilege to vote in any State is not given by the Federal Constitution, or by any of its amendments. It is not a privilege springing from citizenship of the United States. It may not be refused on account of race, color or previous condition of servitude, but it does not follow from mere citizenship of the United States. In other words, the privilege to vote in a State is within the jurisdiction of the state itself, to be exercised as the state may direct, and upon such terms

that the law in question "* * * is neither an unlawful discrimination against * * * the plaintiff * * * nor does it deny him the equal protection of the laws * * * nor [is it] a violation of any implied guarantees of the Federal Constitution." 193 U.S. at 633, 24 S.Ct. at 576. Although *Pope's* value may be largely historical, more recent decisions in a closely related area support the conclusion that the states are still given considerable latitude in imposing durational residency requirements under the traditional "rational basis" standard.

The constitutionality of a state-imposed residency requirement in presidential elections has been tested in Drueding v. Devlin, 234 F.Supp. 721 (D.Md.1964), aff'd per curiam, 380 U.S. 125, 85 S.Ct. 807, 13 L.Ed.2d 792 (1965), and Hall v. Beals, 292 F.Supp. 610 (D.Colo.1968), vacated per curiam, 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969). In both cases it was contended that the state constitutional and statutory requirements, purportedly enacted pursuant to U.S.Const. Art. II § 1,[3] violated the Equal Protection Clause of the Fourteenth Amendment.

The three-judge district court in *Drueding* specifically limited its holding by noting that the plaintiffs in that case were "* * * not attack[ing] the validity of those provisions insofar as they apply to elections other than those for President and Vice President." 234 F.Supp. at 722. In upholding Maryland's one-year residence requirement for presidential elections, the Court held that a state could impose residency requirements "* * * so long as such requirements do not discriminate against any class of citizens by reason of race, color or other invidious ground and are not so unreasonable as to violate the Equal Protection Clause of the Fourteenth Amendment." 234 F.Supp. at 723. Where the purpose of the residency requirement was to (1) identify the voter and protect against fraud and (2) insure that the voter would in fact become a member of the community and as such have a legitimate interest in its government, the Court could not find that the one-year residency requirement amounted to an irrational or unreasonable discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. 234 F.Supp. at 725. These same reasons are claimed as justification for the same durational residency requirement here.

Hall v. Beals, 292 F.Supp. 610 (D.Colo. 1968), an action attacking a Colorado six-months residency requirement for presidential elections, was initially disposed of on the "positive authority" of *Drueding*. 292 F.Supp. at 615. On appeal, the Supreme Court refused to render a decision on the merits because (1) by the time of appeal the election in question was over and, hence, the issue originally presented was moot; (2) subsequent to the three-judge decision, Colorado amended its statute and at the time of appeal imposed only a two-months residency requirement which plaintiff satisfied and, therefore, had no standing to contest. 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969).

Mr. Justice Marshall, dissenting in Hall v. Beals, viewed the compelling state interest test of *Kramer, supra,* as the proper standard to be applied and stated: "It seems to me clear that *Drueding* is not good law today." 90 S.Ct. at 203. Insofar as state residency requirements for *presidential* elections are concerned, the Voting Rights Amendments of 1970, H.R. 4249, *amending* Voting Rights Act of 1965, 42 U.S.C. § 1973 et seq., would

as it may seem proper, provided, of course, no discrimination is made between individuals, in violation of the Federal Constitution. 193 U.S. at 632, 24 S.Ct. 573, at 575 (citations omitted).

3. Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress. * * *

appear to support Mr. Justice Marshall's reasoning. The newly enacted Title II purportedly overrules the precise holding of *Drueding* and the three-judge decision in *Beals* by abolishing state durational residency requirements for presidential elections.[4] One of the congressional findings stated in said Title II for abolishing such residential requirements is that they "do not bear a reasonable relationship to any compelling state interest in the conduct of presidential elections."

■ Without intimating any opinion whatever as to the constitutionality of Title II, suffice it to say that its mandate is not determinative of the issues in this case. The question of state durational residency requirements insofar as they precondition registration and voting in *state* elections remains. Precisely to what extent Title II has nullified the rationale of *Drueding* and *Beals* is not clear, but it appears that insofar as state requirements for state elections are concerned the reasoning of those cases is still valid. Absent a clearer indication from Congess or the Supreme Court, we can find no equal protection violation warranting the invalidation of Arizona's one-year residency requirement for state elections.

## PRIVILEGES AND IMMUNITIES CLAUSE

Claiming that the right to vote for the offices of United States Senator and Representative is a privilege of a citizen of the United States, plaintiff invokes 42 U.S.C. § 1983 and the provisions granting jurisdiction to hear cases of illegal deprivation of civil rights, 28 U.S.C. § 1343. *See* Tullier v. Giordano, 265 F.2d 1 (5th Cir. 1959).

The constitutional basis of both the right to vote for congressional candidates and of state control in such elections was discussed in Lassiter v. Northampton County Board of Elections, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959).

Article I, § 2 of the Constitution in its provision for the election of members of the House of Representatives and the Seventeenth Amendment in its provision for the election of Senators provide that officials will be chosen "by the People." Each provision goes on to state that "the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." So while the right of suffrage is established and guaranteed by the Constitution it is subject to the imposition of state standards which are not discriminatory and which do not contravene any restriction that Congress acting pursuant to its constitutional powers, has imposed. \* \* \* 360 U.S. at 51, 79 S.Ct. at 989–990 (citations omitted).

And although in Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), Georgia's congressional *apportionment* scheme was declared unconstitutional under Art. 1 § 2, the decision was based on the "by the People" clause of that section alone, and not upon the phrase which sanctions the imposition

---

4. Congress apparently had a change of heart after the inconclusive determination of Hall v. Beals. In a House Judiciary Committee report dated July 28, 1969, but only published along with the publication of H.R. 4249 (June 22, 1970), giving reasons for rejecting certain amendments, it was noted:

Second, to establish a uniform residence requirement for voting for the Chief Executive anticipating a case now pending in the Supreme Court [Hall v. Beals] which challenges the constitutionality of existing residence requirements for voting in presidential elections. It also introduces a subject not related to ending voting discrimination based on race or color. Moreover, several members of the committee raised doubts concerning the constitutional authority of the Congress to legislate with regard to residence requirements. The consensus of the committee was that this subject should await further study. H.R.Rep. No. 91-397, 91st Cong., 2nd Sess. (1970), United States Code Congressional and Administrative News, p. 2155 (1970).

of state standards on availability of ballot.[5]

■ Having already determined that in relation to voting for state officials Arizona's residency requirement is not violative of the Equal Protection Clause, there is no constitutional reason why a different standard or result should obtain simply because the state election also involves candidates for the offices of United States Senator and Representative. The explicit hybrid nature of Art. 1 § 2 and the Seventeenth Amendment leaves little doubt that the states can, subject to Fourteenth Amendment scrutiny, impose specifications or qualifications on the exercise of voting for the offices of United States Senator and Representative. As noted, Arizona's one-year residency requirement withstands that scrutiny.

## CONSTITUTIONAL RIGHT OF FREEDOM TO TRAVEL

■ It is persuasively urged that the reasoning of Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), be extended to encompass the issues at hand. There is, however, strong indication in *Shapiro* that, within the context of the constitutional right to travel, the compelling state interest test should not be applied to invalidate state durational residency requirements for voting. In an express caveat the Court stated:

> We imply no view of the validity of waiting-period *or* residence requirements determining eligibility to vote. * * * Such requirements may promote compelling state interests on the one hand, or, on the other, may not be penalties upon the exercise of the constitutional right of interstate travel. 394 U.S. at 638, 89 S.Ct. at 1333, n. 21.

Although it is arguable that this footnote implicitly recognizes the compelling state interest test as applicable in determining the constitutionality of state voting residency requirements, it can be more definitely asserted that in the context of a constitutional right to travel the Court recognized a distinction between state-imposed residency requirements as a condition to receiving welfare benefits and those durational residency requirements imposed as a qualification to vote.[6] While this Court has not hesitated to apply the *Shapiro* rationale in an appropriate case, see Vaughan v. Bower, D.C., 313 F.Supp. 37 (1970), we feel the above-mentioned distinction, however artificial, is nevertheless binding and accordingly cannot find Arizona's one-year residency requirement to be an unconstitutional penalty on the right of freedom of travel in violation of

---

5. The case before this Court being one of state-imposed qualifications, U.S.Const. Art. 1 § 4 and cases decided thereunder are not directly applicable.

6. In scoring the lack of justification for such a distinction, Mr. Chief Justice Warren joined by Mr. Justice Black in dissent noted:

   Nor can I understand the Court's implication * * * that other state residence requirements such as those employed in determining eligibility to vote do not present constitutional questions. Despite the fact that in Drueding v. Devlin, we affirmed an appeal from a three-judge District Court after the District Court had rejected a constitutional challenge to Maryland's one-year residence requirement for presidential elections, the rationale employed by the Court in these [*Shapiro*] appeals would seem to require the opposite conclusion. If a State would violate equal protection by denying welfare benefits to those who have recently moved interstate, then it would appear to follow that equal protection would also be denied by depriving those who have recently moved interstate of the fundamental right to vote. There is nothing in the opinion of the Court to explain this dichotomy. * * * 394 U.S. at 654, 89 S.Ct. at 1342 (citations omitted).

the Equal Protection Clause of the Fourteenth Amendment.

## DUE PROCESS

 Plaintiff contends her disfranchisement occasioned by Arizona's residency requirement violates the Due Process Clauses of U.S.Const. Amends. V and XIV. Orderly administration of elections, maintaining the purity of same and assuring some kind of voter education in local issues may no longer be rational or permissible goals of state residency requirements for presidential elections, but the same cannot be said for such requirements for state elections. Any justification for Arizona's one-year requirement is considerably eroded by the fact that no systematic or even cursory attempt was made to verify representations on the registration form. Nevertheless, in finding *Drueding* and the rationale therein to be still binding as to state elections, we cannot say that Arizona's durational residency requirement violates the Due Process Clause of U.S.Const. Amends. V and XIV.

In reaching its decision, this Court has considered the recent decisions of two other three-judge District Courts which have reached results contrary to the decision of this Court: Burg v. Canniffe et al., 315 F.Supp. 380 (D.Mass.1970); Blumstein v. Ellington, et al., M.D.Tenn. Civ. 5815, Aug. 3, 1970.

Because we can find no constitutional infirmity in Arizona's durational residency requirement, we need not discuss the demand for damages.

There being a lack of a serious dispute as to any material fact not reflected above, the foregoing shall suffice as findings of fact and conclusions of law.

Wherefore, it is ordered

That Judgment is granted as prayed for by defendant; plaintiff's requests for preliminary and permanent injunction and damages are denied; and defendant shall have her costs.