William J. KEPPEL and Michael J. Radmer, individually, and on behalf of the class of similarly situated residents of the State of Minnesota, Plaintiffs,

v.

Joseph L. DONOVAN, Secretary of the State of Minnesota, Richard Johanson, Clerk and Commissioner of Voter Registration of the City of Minneapolis, Vern Janowiec, Deputy Commissioner of Voter Registration for the City of Minneapolis, Hennepin County, and Hesther Truax, Municipal Clerk for the City of Crystal, Defendants.

No. 4–70 Civ. 423.

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 4, 1970.

William J. Keppel and Michael J. Radmer, Minneapolis, Minn., for plaintiffs.

Douglas M. Head, Atty. Gen., and Jerome D. Truhn, Sol. Gen., St. Paul, Minn., for defendants.

Before HEANEY, Circuit Judge, and NORDBYE and LORD, District Judges.

## OPINION AND ORDER

MILES W. LORD, District Judge.

### I

Plaintiff William J. Keppel, 29, a former resident of Wisconsin, moved to Minnesota on or about June 15, 1970. Plaintiff Michael J. Radmer, 25, moved to Minnesota from the Commonwealth of Massachusetts about June 10, 1970. Both are members of the Bar of the State of Minnesota, are associates in a Minneapolis law firm, and intend to remain permanently as residents of the state. No question is raised as to the validity of their status as residents of Minnesota.

Plaintiffs sought to register in the November 3, 1970, general election. They were not permitted to register to vote by the terms of Article VII of the Constitution of the State of Minnesota which requires that citizens must be residents of the state for six months preceding the election in order to be eligible to vote. This residency requirement is also referred to and expressed in Minnesota Statutes 200.02 and 204.075.

Plaintiffs then brought this action for injunctive and declaratory relief. They assert that Article VII of the state Constitution and Minnesota Statutes 200.02 and 204.075, insofar as they require six months' residency for voting eligibility, are unconstitutional under the Equal Protection clause of the Fourteenth Amendment to the United States Constitution.

The plaintiffs sought to maintain the action on behalf of themselves and all those similarly situated, i. e., those residents of Minnesota who were denied the franchise because they had not resided in the state for six months next preceding the election.

A temporary restraining order was issued twenty days before the election— the last day on which citizens could register to vote under Minnesota law—enjoining the voter registration officials from refusing to permit the named plaintiffs to register.

Because plaintiffs challenge the operation of sections of the Minnesota Constitution and statutes, a three-judge court was convened pursuant to 28 U.S.C.A. 2281 et seq.[1]

After hearing the arguments of counsel on the merits, this Court issued an order that permitted the named plaintiffs, Keppel and Radmer, to vote, but kept their ballots impounded pending the filing of this decision.

Since the named plaintiffs were the only members of the class who were permitted to register and to cast ballots on election day they constitute the only members of the class for the purposes of the immediate relief to be granted by this decision. Thus, these named plaintiffs cannot properly maintain a class

---

1. Under 28 U.S.C.A. 2281 et seq., a three-judge court is to be convened in an action to enjoin the "enforcement, operation or execution of any State statute." In the context of 28 U.S.C.A. 2281, "any State statute" also means a provision of the state constitution. Roman et al. v. Sincock et al., 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964). Thus, although the instant case mainly involves a provision of the Minnesota Constitution, jurisdiction of this three-judge Court is not in question.

action, but the relief granted here, inasmuch as it is declaratory in nature, benefits a class of persons who in the future would be similarly situated.[2]

## II

We are mindful of the traditional prerogative that states have possessed in determining eligibility standards for voting. However, in light of recent constitutional doctrine which we shall discuss below, we conclude that Article VII of the Minnesota Constitution and Minnesota Statutes 200.02 and 204.075, to the extent that they require six months' residency for voting eligibility, are contrary to the United States Constitution.

The United States Constitution refers to voting qualifications in seven separate places.[3] None of these references, however, specifically deals with the limits within which the states can impose residency requirements. These references perhaps acknowledge by their silence what the Supreme Court stated in Lassiter v. Northampton County Board of Elections, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959):

> The States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised, * * * absent of course the discrimination which the Constitution condemns. 360 U.S. at 50–51, 79 S.Ct. at 989.

The Constitution has never been regarded as giving the states unchecked authority to set voting eligibility. In Ex Parte Yarbrough, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884), the Supreme Court said:

> (T)he right of suffrage was considered to be of supreme importance to the national government, and was not intended to be left within the exclusive control of the states. * * * 110 U.S. at 664, 4 S.Ct. at 158.

The Supreme Court in Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), in striking down Virginia's poll tax, said:

> (O)nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection clause of the Fourteenth Amendment. 383 U.S. at 665, 86 S.Ct. at 1081.

And in Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), the Supreme Court referred to the franchise as a "fundamental political right, because preservative of all rights," 118 U.S. at 370, 6 S.Ct. at 1071.

Early cases do not provide much precedential value to the instant case, because the careful scrutiny given by the Supreme Court and lower federal courts to state-imposed voting eligibility standards is a relatively recent development; e. g., Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), Harper v. Virginia State Board of Elections, *supra*, Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965), Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L. Ed.2d 506 (1964), Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), *Lassiter, supra*, Avery v. Midland County et al., 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968), Evans v. Cornman, 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970), and City of Phoenix, Ariz. v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970).

Thus, Pope v. Williams, 193 U.S. 621, 24 S.Ct. 573, 48 L.Ed. 817 (1904), a case dealing indirectly with residency for voting and relied upon by defendants here, is inapposite. In *Pope*, the Supreme Court upheld a Maryland statute that required citizens moving into the state to declare an intent to remain one

---

2. For estimates of the number of persons believed to be in this category, see text accompanying footnote No. 4.

3. Article 1, Sec. 2, Cl. 1; Art. 1, Sec. 4, Cl. 1; 14th, 15th, 17th, 19th and 24th Amendments to the United States Constitution.

year before being permitted to register to vote. The Court, answering the argument that this statute abridged a privilege of United States citizenship, said:

> (T)he privilege to vote in any state is not given by the Federal Constitution * * *. It is not a privilege springing from citizenship of the United States.

The Court said that the federal Constitution prohibited discrimination among different classes of voters, but did not reach the question whether the discrimination between longtime residents and recently arrived residents was permissible under the Fourteenth Amendment. Whether the Court at that time would have seriously considered an Equal Protection argument is not relevant today, for as the Court said some 60 years later in *Harper, supra*:

> (T)he Equal Protection Clause is not shackled to the political theory of a particular era. In determining what lines are constitutionally discriminatory, we have never been confined to historic notions of equality, any more than we have restricted due process to a fixed catalogue of what was at a given time deemed to be the limits of fundamental rights. * * * Notions of what constitutes equal treatment for purpose of the Equal Protection Clause *do* change. 383 U.S. at 669, 86 S.Ct. at 1083.

Thus, even in Cocanower v. Marston, 318 F.Supp. 402 (D.Ariz.1970), a case supporting defendant's position, the court admitted that the value of *Pope* "may be largely historical."

### III

It is therefore clear that the Minnesota residency requirement must be given close scrutiny to determine whether it violates the Fourteenth Amendment. The Minnesota requirement discriminates against new residents in that they are not permitted to vote. In the 1968 general election, there were 34,000 persons estimated to have been denied the franchise by the state's residency requirement, according to the U. S. Department of Commerce;[4] by affidavit the Assistant Secretary of State of Minnesota says that an estimated 30,000 to 40,000 persons failed to meet the residency requirement for the November 3, 1970 election.

Defendants argue that the state need only show a reasonable or rational basis for this discrimination; plaintiffs assert that the state must show a "compelling interest" in order to justify the denial of the franchise to new residents.[5]

In support of their argument, defendants cite Drueding v. Devlin, 234 F. Supp. 721 (D.Md.1964), aff'd per curiam, 380 U.S. 125, 85 S.Ct. 807, 13 L. Ed.2d 792 (1965). In *Drueding*, a three-judge court upheld a Maryland Statute that required one year's residency in order to be eligible to vote in a Presidential election. The District Court held that the crucial question was whether the discrimination was unreasonable:

> The Court cannot say that the requirements of the Maryland Constitution and statutes in question here are so unreasonable that they amount to an irrational or unreasonable discrimination.

The full text of the Supreme Court's affirmance is "The judgment is affirmed." 380 U.S. at 125, 85 S.Ct. 807.

In 1969, the Supreme Court in Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583, struck down a New York statute that required that citizens own or lease taxable realty in order to be eligible to vote in a school district election. The Court said:

> Statutes granting the franchise to residents on a selective basis always pose the danger of denying some citizens

4. U. S. Department of Commerce, *Population Estimates.*

5. As we have said, there is no doubt that plaintiffs here are residents; this case does not deal with Minnesota's prerogative to require persons to be residents in order to vote.

any effective voice in the governmental affairs which substantially affect their lives. Therefore, if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, *the Court must determine whether the exclusions are necessary to promote a compelling state interest.* 395 U.S. at 626–627, 89 S.Ct. at 1889–1890; (emphasis added).

Therefore, as Mr. Justice Marshall pointed out in his dissent in Hall v. Beals, 396 U.S. 45, 90 S.Ct. 200, 24 L. Ed.2d 214 (1969): "It seems to me clear that *Drueding* is not good law today." Hall v. Beals involved a challenge to Colorado's six-month residency requirement for voting in Presidential elections. The District Court had upheld the requirement. While the case was being appealed, the Colorado Legislature changed the residency requirement to two months. The Supreme Court held that the case was moot. After dissenting on the issue of mootness, Mr. Justice Marshall went on to the merits:

In *Drueding,* the District Court tested the residency requirement there challenged by the equal-protection standard applied to ordinary state regulations: that is, restrictions need bear only some rational relationship to a legitimate end. 234 F.Supp., at 724–725, citing McGowan v. Maryland, 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). But if it was not clear in 1965 it is clear now that once a State has determined that a decision is to be made by popular vote, it may exclude persons from the franchise only upon a showing of a compelling state interest, and even then only when the exclusion is the least restrictive method of achieving the desired purpose. 396 U.S. at 52, 90 S. Ct. at 203.

That the Supreme Court intends the compelling state interest to apply to residency requirements for voting is indicated in Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) where the state-imposed waiting period or residency requirement for welfare was struck down. In warning that Shapiro v. Thompson does not apply to residency requirements for voting, the court said in a footnote:

We imply no view of the validity of waiting-period or residence requirements determining eligibility to vote * * *. Such requirements may promote compelling state interests on the one hand, or, on the other, may not be penalties upon the exercise of the constitutional right of interstate travel. 394 U.S. at 638, Footnote 21, 89 S.Ct. at 1333.

Clearly the import of this statement is that if residency requirements are to be found valid, they must satisfy a compelling state interest test; there is no recognition of a reasonableness or rationality standard.

Despite the Supreme Court's *caveat*, we think the decision in Shapiro v. Thompson in some way affects the validity of durational residency requirements for voting. In his dissent, Mr. Chief Justice Warren said:

Despite the fact that in Drueding v. Devlin, 380 U.S. 125, 85 S.Ct. 807, 13 L.Ed.2d 792 (1965), we affirmed an appeal from a three-judge District Court after the District Court had rejected a constitutional challenge to Maryland's one-year residence requirement for presidential elections, 292 F. Supp. 610, the rationale employed by the Court in these appeals (Shapiro v. Thompson and companion cases) would seem to require the opposite conclusion. If a State would violate equal protection by denying welfare benefits to those who have recently moved interstate, then it would appear to follow that equal protection would also be denied by depriving those who have recently moved interstate of the fundamental right to vote. 394 U.S. at 654, 89 S.Ct. at 1342.

In Shapiro v. Thompson, the statutes denying welfare benefits to those moving interstate were specifically designed to prevent or discourage indigents from

moving from one state to another by denying them the necessities of life in their new states. The fundamental right directly interfered with was the right to travel interstate. In the instant case there is no argument that the durational residency requirement for voting is specifically designed to prevent or discourage interstate travel. However, the durational residency requirement for voting does attach a penalty to the person who chooses to move from one state to another in that he is deprived for a time of his fundamental right to vote. Admittedly the penalty that attaches in the instant case is less severe than in Shapiro v. Thompson, where the necessities of life were denied. A three-judge court recently struck down Vermont's durational residency requirement for voting and, in an apparent reference to Shapiro v. Thompson said the durational residency requirement limits two fundamental rights, the right to vote and the right to travel interstate. To sustain its intrusion on these rights, the court said, Vermont must show a compelling state interest served by the requirement; this it has failed to do. Kohn v. Davis, 320 F.Supp. 246 (D.Vt., 1970).

While the Supreme Court's above-quoted *caveat* prevents us from basing our decision here squarely on Shapiro v. Thompson, we nonetheless conclude that the Court's reasoning there buttresses our decision in the instant case. And most importantly, the Court in Shapiro v. Thompson acknowledged that infringements on the right to vote must be necessary to promote a compelling state interest.

The Supreme Court also applied the compelling state interest test in two voting cases last term. In Evans v. Cornman, 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970) the Court struck down a refusal by the state of Maryland to permit persons living in a federal enclave to vote in the state. The Court said:

> (B)efore that right (to vote) can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet close constitutional scrutiny.
>
> \*   \*   \*   \*   \*   \*
>
> Without deciding the question, we have assumed that such an interest could be sufficiently compelling to justify limitations on the suffrage, at least with regard to some elections. 398 U.S. at 422, 90 S.Ct. at 1755.

Similarly, in City of Phoenix, Ariz. v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970), the Court struck down an Arizona statute that permitted only real property taxpayers to vote in an election on general obligation municipal bonds. The Court said:

> Placing such power in property owners alone can be justified only by some overriding interest of those owners which the State is entitled to recognize. 399 U.S. at 209, 90 S.Ct. at 1994.

The Court's references to "sufficiently compelling" interest in the former case and to "some overriding interest" in the latter case leave no doubt that the rational or reasonable test is no longer valid.

Other courts which recently have struck down state residency requirements for voting have applied the compelling state interest test. In Burg v. Canniffe, 315 F.Supp. 380 (D.Mass. 1970), the court said:

> Any lingering doubts that the compelling interest test must be used in determining the validity of state voting statutes attacked on equal protection grounds would appear to be permanently put to rest by two decisions of the Supreme Court \* \* \* Evans v. Cornman \* \* \* and \* \* \* City of Phoenix, Ariz. v. Kolodziejski \* \* \*.

The reasoning we have set forth here, which mandates the application of the compelling state interest test, was followed also in Blumstein v. Ellington (M.D.Tenn. August 31, 1970), Kohn v. Davis, *supra*, Bufford v. Holton, 319 F. Supp. 843 (E.D.Va., 1970), and in Kean

v. Mihaly, 11 Cal.App.3d 1037, 90 Cal. Rptr. 263 (California Court of Appeals, First Division, October 7, 1970).[6] After pointing out how the compelling state interest test has superceded the rationality or reasonableness test of state regulation of voting eligibility, the court in *Keane* said:

> Thus, while we surely would follow the *Pope* and *Drueding* cases had not the United States Supreme Court in later cases established a new standard * * * we should be dishonoring rather than respecting the decisions of the highest tribunal of our nation if we did not follow its later expressions of constitutional interpretation.

In addition to the case law we have cited, we note that the Voting Rights Act Amendments of 1970 eliminated durational residency requirements for Presidential and Vice-Presidential voting. The findings of Congress in passing the 1970 Amendments reflect the trend of the law and support our decision here. The relevant parts of Congress' findings are:

> Sec. 202. (a) The Congress hereby finds that the imposition and application of the durational residency requirement as a precondition to voting for the offices of President and Vice-President, and the lack of sufficient opportunities for absentee registration and absentee balloting in presidential elections—
>
> (1) denies or abridges the inherent constitutional right of citizens to vote for their President and Vice-President;
>
> (2) denies or abridges the inherent constitutional right of citizens to enjoy their free movement across state lines;
>
> (3) denies or abridges the privileges and immunities guaranteed to the citizens of each State under Arti-

cle IV, Section 2, Clause 1 of the Constitution;

> (4) in some instances has the impermissible purpose or effect of denying citizens the right to vote for such officers because of the way they might vote;
>
> (5) has the effect of denying to citizens the equality of civil rights, and due process and equal protection of the laws that are guaranteed to them under the fourteenth amendment; and
>
> (6) does not bear a reasonable relationship to any compelling State interest in the conduct of Presidential elections.

Reflected in Congress' findings are the decisions of the Supreme Court in Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965), Shapiro v. Thompson, *supra*, and Kramer v. Union Free School District, *supra*. It is especially significant that the findings adopt the compelling state interest test (in No. 6), a recognition that *Kramer* has cast overwhelming doubt on the rationality or reasonableness test of *Drueding, supra*. Congress' abolition of the residency requirements for Presidential elections was upheld by a three-judge court recently: Christopher v. Mitchell, 318 F.Supp. 994 (D.D.C., 1970). Arguably, the state durational residency requirements are less justifiable for Presidential than for state and local elections. However, we must note the language of the Supreme Court in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), where it was held that both houses of a state legislature must be apportioned according to population. The Court there said:

> Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections. * * * The right to vote freely for the candi-

---

6. Of the five cases we have found that dealt with challenges to state residency requirements for voting this year, only one, Cocanower v. Marston, 318 F.Supp. 402 (D.Ariz.1970), applied the test of reasonableness and upheld a durational residency requirement for voting. Because it relied upon *Drueding*, which we believe is no longer the law, we find *Cocanower* unconvincing.

date of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. 377 U.S. at 554 and 555, 84 S.Ct. at 1377–1378.

■ Finally we note that in Rimarcik v. Johansen, 310 F.Supp. 61 (D. Minn.1970), this Court discussed the applicable test of a state infringement on voting after carefully considering Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), *Kramer, supra,* Reynolds v. Sims, *supra,* Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969), and *Harper, supra,* among others. We concluded: "The test is not whether there is a 'rational basis' for the distinctions made, but rather whether the distinctions are necessary to promote a compelling state interest." Our conclusion in the instant case is the same.

## IV

We turn then to the question of whether defendants have shown that Minnesota's durational residency requirement is necessary to promote a compelling state interest.

Defendants assert that two interests of the state support Minnesota's durational residency requirement: "1) identification of the voter and protection against fraud and 2) insurance that the voter will become a member of the community and have, therefore, a common interest in matters pertaining to its government." Our task is to examine these asserted interests and determine whether they justify the disenfranchisement of that category of residents who have lived in the state less than six months.

Article VII of the Minnesota Constitution sets two residency requirements for voting. The first is that the voter be a resident of the state for six months; the second is that he be a resident of his election district or precinct for thirty days next preceding the election. The latter requirement is not challenged here, nor is there a challenge to the provision that persons eligible to vote register at least twenty days before an election in municipalities where a registration system is in effect.

In the 1968 general election, 1,606,307 persons voted, according to the *Report of the State Canvassing Board* cited in defendants' brief. About 900,000 voted in localities that had registration systems pursuant to Minnesota Statutes 201.02 (Cities of more than 10,000 population or those in which the local governing body voted to have a registration system). Most of the remainder voted in communities where registration is not required. In these communities, persons vote simply by personal identification, subject to challenge on election day. Minnesota thus has two checks upon the misuse of the franchise—a formal registration system and the informal test of personal recognition in small communities.

We are unable to determine, however, how the six-month residency requirement promotes either of these devices for preventing voting fraud. If defendants argue, as we think they do, that the six months residency helps in the small communities where voting is permitted upon personal recognition, their argument is specious. If a person moves from one part of the state to a small community in a distant part of the state, he will be eligible to vote after having lived in his new community for only thirty days. Conceivably this person could have moved from a point in the state 300 miles away, and there is no way that the six-month residency requirement makes identification of him any easier. As for the registration system, new voters are merely asked to certify that they have been residents of the state for six months. There is no showing that any investigation is made into actual length of residency, or that the six-month period is needed for determining eligibility or detecting fraud. The voting officials have the twenty-day period after registration closes in which to compile the list of voters. There is no

showing of any practical relation between the six-month residency requirement and the administrative needs of the state.

■ Defendants further assert: "The plaintiffs cannot affirmatively show that voter fraud would not result from invalidation of Minnesota's six-month residency requirement." This is not at all the question under the compelling state interest test. The question is whether the state can show that voting fraud would result without the six-month requirement and that this requirement is necessary to prevent such fraud. Inasmuch as the state has the thirty-day precinct requirement and in the larger communities a twenty-day registration deadline, the state has not shown that its interest in the prevention of voting fraud is sufficiently related to the six-month residency requirement to satisfy the compelling state interest test. Similar conclusions were reached in recent cases, cited *supra*, in which residency requirements were invalidated. In Blumstein v. Ellington, *supra*, the court said:

(A)ssuming that Tennessee's interest in promoting freedom and purity of the ballot box and preventing plural voting is a compelling one, it is clear that that State's durational residency requirements are in no wise "necessary" to promote such an interest.

We of course note that the *Blumstein* decision invalidated a one-year residency requirement whereas the instant case deals only with a six-month requirement. However, the reasoning is the same in both cases, even though the residency requirement here is not as broadly discriminatory as the one-year rule. In neither case has the state shown that its durational residency requirement is necessary to promote a compelling interest.

We turn then to the second interest which the state asserts in its six-month residency requirement: "to insure minimum nexus between the voter and the community." On this issue, the arguments become even less definitive than

they were for the state's interest in preventing fraud. In oral argument, plaintiffs stated:

(A)n informed electorate is the result of voter interest rather than any durational residency requirement. A person living in Minnesota for one month perhaps may have as good an acquaintance with local issues as a person living here for one year, or ten years, or even a hundred years, if those latter classifications are not interested in the issues that are going to be at stake in the election. (Partial Transcript, p. 4)

Defendants in their brief assert:

(T)he fund of knowledge is not at issue here, but rather that time for the digestion of the abundant information is the essential ingredient for an informed electorate and what is sought to be protected by the six-month residency requirement. It is less inconvenient to listen to what is superfluous than to be left ignorant as to what is essential by the absence of time for sober reflection. (Defendant's Brief, p. 15)

One of the bases on which plaintiffs object to the six-month residency requirement is illustrated by the following example: A person can move from International Falls, Minn., to Minneapolis thirty days prior to the election and vote. His vote is cast on issues and candidates that are strictly local, even though he has moved from a city about 300 miles distant. If a person moved from Hudson, Wisconsin to Minneapolis, Minnesota, a distance of about 30 miles, he is ineligible to vote. There is thus no showing that the person from International Falls is any more cognizant of the local issues or has any more of a "nexus" with the community than the person from Hudson, Wisconsin. We must note that the person from International Falls may have an advantage as to state-wide elections over a person from outside the state, but it does not necessarily follow that the longtime state resident will have an advantage in local elections.

As plaintiffs have argued, the information a voter gets is more a function of his interest than of his durational residency. Plaintiffs argue that through modern mass communications, the voter today gets a more concentrated and complete dosage of information on the issues and candidates than did the Minnesota voter of 1857 when the Minnesota Constitution was enacted.

■ We can presume that a person who is interested enough to vote will inform himself sufficiently to make his choices; this is a presumption that is made of all voters, whether they are longtime residents or relatively recent arrivals. Similarly, there is a risk to the state that voters will not be adequately informed when they cast their ballots. This is a risk that is true of all voters, and we cannot determine whether that risk is significantly greater for recent residents than for longtime residents. But even if the risk is greater for the category of recent residents, we do not think it is so great that it justifies a denial of their right to vote.[7] While the state may pass laws to promote the goal of having an informed electorate, there is no justification for fencing out a significant sector of the electorate because of an irrebuttable presumption that they *will* be uninformed.

### V

Arguments about voter awareness and prevention of voting fraud could be discussed much further, but we believe the arguments set forth here adequately resolve these issues in the instant case. If this case dealt with an ordinary state regulation, one for example that involved intrastate commerce, it would be enough for us to say that it was for the Legislature to decide; absent a showing of unreasonableness, the regulation would have to be upheld. McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). But here, the state's durational residency requirement affects a fundamental right and, as we have said, must be necessary to promote a compelling state interest. In cases that involve provisions of the state Constitution, this Court seriously considers the state interests at stake. The fact that Minnesota's durational residency requirement is written into the state Constitution deserves consideration. However, that very factor complicates the Legislature's task of making accommodations that are called for by the changing conditions of modern life. It is not enough to say that this is a matter for the Legislature, for the Legislature finds itself torn between the archaic state constitutional mandate and the demands of modern society. Thus, the review of the requirement herein challenged is especially proper for this Court.

■ We recognize that a reasonable residency requirement for citizens of this state to be entitled to vote may well be within the bounds of the state's com-

---

7. There is an analogy, albeit a weak one, between the instant case and Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) where the Supreme Court struck down a Texas law that prohibited those in the military from voting in the state. In *Carrington* the state interest could be said to be that voters have a sufficient identification or "nexus" with the community; the state's fear was that these voters would vote down bond issues, or take over local government if the community were small enough. The Court said:

> But if they are in fact residents, * * * they, as all other qualified residents, have a right to an equal opportunity for political representation. * * *

'Fencing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible. 380 U.S. at 94, 85 S.Ct. at 779.

In the instant case, Minnesota can be said to be "fencing out" a group of residents from the franchise because they *may* vote in an uninformed manner, or because they may not have received (as Justice Marshall said in Hall v. Beals, *supra*) "indoctrination in local attitudes." Though Carrington v. Rash is not directly applicable here, that case shows one possible infirmity in the state's residency requirement—that residents may have been excluded because of the way they may vote.

pelling interest to have an informed electorate on state and local issues. However, it is not our purpose to make any definitive finding as to the length of time a citizen of the state must reside herein to justify a finding that the state's compelling interest justifies any particular period of residency requirement. Suffice it to say that, on the showing here, the six-month period of residency does not bear a reasonable relationship to any compelling state interest in the conduct of its elections.

We therefore hold that the six-month residency requirement for voting, in that it denies the franchise to a significant number of otherwise qualified .citizens without necessarily promoting a compelling state interest, is a denial of equal protection and is thus invalid.