Michael R. **FONTHAM** et al.

v.

**John J. McKEITHEN, Governor of the State of Louisiana and Member of the Board of Voter Registration, et al.**

Civ. A. No. 71–2631.

United States District Court,
E. D. Louisiana,
New Orleans Division.

Dec. 7, 1971.

Michael R. Fontham, New Orleans, La., for plaintiffs.

Weldon A. Cousins, Asst. Atty. Gen., State of Louisiana, New Orleans, La., for defendants McKeithen, Aycock, Garrett, Gremillion, Papale and Bankston.

John Mamoulides, Jacob J. Amato, Jr., Asst. Dist. Attys., Parish of Jefferson, Gretna, La., for defendant, Altobello.

Before WISDOM, Circuit Judge, and WEST and GORDON, District Judges.

R. BLAKE WEST, District Judge:

A three-judge court was convened in this matter to consider the constitutionality of various Louisiana durational residency requirements as pre-conditions for voter eligibility in a State general

election. Plaintiffs seek to enjoin officers of the State of Louisiana from enforcing State statutes which are allegedly in violation of the Equal Protection and Due Process Clauses of the United States Constitution.

Louisiana maintains durational residency requirements for voting in State elections. In order to be eligible to register to vote, a prospective voter must have been a resident of the State for one year and of the Parish for six months preceding the election in which he seeks to vote.[1] Plaintiffs satisfy all other requirements for voter eligibility except durational residency.[2]

Louisiana law also provides for a temporary suspension of voter eligibility upon a change of political party affiliation.[3] A voter who changes party affiliation is not permitted to vote for a period of six months in any primary held by the party to which he has changed. However, an independent, a person registered to vote without declaration of party

affiliation, may change his registration and vote immediately in the primary election of his new party without becoming subject to the six month suspension of voter eligibility.

■ Plaintiffs' complaint, therefore, attacks the requirements of (1) one year state residency; (2) six month parish residency; and (3) six month suspension of voter eligibility upon change of party affiliation. Particularly, it is alleged that Louisiana has no compelling state interest in imposing the requirements complained of, and that the requirements are violative of the Equal Protection and Due Process Clauses in that they unduly restrict the right to vote and the right to travel guaranteed by the United States Constitution. It is the decision of this Court that plaintiffs' attacks on the statutes in question fail to overcome the presumption of constitutionality afforded the statutes and that the relief sought by plaintiffs should be denied.

1. LSA–R.S. 18:270.202 reads in part:
   "Every citizen of the United States and of Louisiana, native born or naturalized, who is twenty-one years of age or who will have attained the age of twenty-one years prior to the next election and who possesses the following qualifications and who has complied with the provisions of this Chapter, shall be eligible for registration as a voter:

   (1) He shall have been an actual bona fide resident of the state for one year, of the parish for six months, and of the municipality in municipal elections four months, and of the precinct in which he offers to register as a voter, three months next preceding any election."

2. This fact is stipulated by all parties. Incidentally, all plaintiffs are Caucasians, and race is not an issue in these proceedings.

3. LSA–R.S. 18:270.204 reads as follows:
   "The applicant need not declare a party affiliation in order to be registered. He shall, however, if he does not wish to affiliate, circle the 'None' on the LR–68 application card. Failure to affiliate however, renders it unlawful for him to vote in any primary of any political

party, as long as he has not declared his party affiliation.
   However, any person may change his party affiliation by applying to the registrar, requesting in writing that the change be made. The registrar, upon such request shall note the political party designated by the registrant in the proper column of the original application card. Such change of affiliation in his registration shall not permit the registrant to vote in any primary held by the political party to which he has changed his affiliation within six months of the change. During this period he may not vote in the primary held by the political party which he has renounced and abandoned.
   Where a registrant has registered without declaration of party affiliation and afterwards desires to affiliate with some party, he shall cause the registrar to enter the party he selects in the proper space of the original application card and on the voting certificate by making written application to him to do so. The designation of party affiliation, in accordance with this Paragraph renders the registrant eligible to vote in the party primary next following the designation. The registrar shall note on the original application card the date of the change of party affiliation."

The matters to be determined herein, stated simply, are whether (1) the Legislature of Louisiana had the legal right to provide that a person coming into this State to reside should wait for a period of one year and a person moving from one parish to another should wait for a period of six months before becoming eligible to vote in State and local elections; and (2) the Legislature of Louisiana had the legal right to provide that a registered voter who changes his political party affiliation should wait for a period of six months before becoming eligible to vote in the primary elections of his new party.

■ The underlying concept in this case is that a resident of a State does not have a *right* to vote in State elections; there is no inherent right to vote, but a *privilege* to vote, which privilege is granted by the State and is not derived from citizenship of the United States. nor granted by the federal Constitution or any of its Amendments. Minor v. Happersett, 21 Wall. 162, 22 L.Ed. 627 (1875).

The privilege to vote in a State election " . . . may not be refused on account of race, color, or previous condition of servitude, but it does not follow from mere citizenship of the United States. In other words, the privilege to vote in a state is within the jurisdiction of the state itself, to be exercised as a state may direct, and upon such terms as to it may seem proper, provided, of course, no discrimination is made between individuals, in violation of the Federal Constitution." Pope v. Williams, 193 U.S. 621, 24 S.Ct. 573, 48 L.Ed. 817 (1904).

■ Thus, the United States Supreme Court has held that the following conditions of suffrage could be imposed with-

out constitutional objection upon its residents: age, Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1971); literacy, Lassiter v. Northampton County Bd. of Elections, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959); and lack of previous criminal record, Davis v. Beason, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637 (1890).

Directly on point, and we believe controlling in the instant case, is the decision of the Supreme Court in Pope v. Williams, quoted above, in which it was held that a Maryland law, requiring persons coming into the State to reside to make a declaration of intention to become citizens and residents of the State as a prerequisite to the right to be registered as voters, was not violative of the federal Constitution.

■ Thus, the principle is well established that the States have "long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised . . . absent of course the discrimination which the Constitution condemns." Lassiter v. Northampton County Bd. of Elections, 360 U.S. 45, 50, 79 S.Ct. 985, 989, 3 L.Ed. 2d 1072, 1076 (1959).

This principle was reaffirmed recently by the Supreme Court in Oregon v. Mitchell, wherein Mr. Justice Black, citing Pope v. Williams, expressed the view of the majority of the Court that Congress was unauthorized by the Fourteenth Amendment's Equal Protection Clause to lower the voting age in State and local elections from twenty-one to eighteen.[4] The Court stated, at 400 U.S. 125, 91 S.Ct. 265, 27 L.Ed.2d 281:

"No function is more essential to the separate and independent existence of the States and their governments than the power to determine within the

4. This view of Congressional capacity was further buttressed by the 1970 Amendments to the 1965 Voting Rights Act. 42 U.S.C. § 1973aa. That statute abolished the durational residency requirement as a pre-condition to voting for the offices of President and Vice President, but imposed no sanction on the right of

the States to maintain reasonable durational residency requirements for State elections. The Amendment indicates clearly that the Congress is unwilling to assume what is properly the role of the States in enacting voter legislation controlling State elections.

limits of the Constitution the qualifications of their own voters for state, county, and municipal offices and the nature of their own machinery for filling local public offices. Pope v. Williams, 193 U.S. 621 [24 S.Ct. 573, 48 L.Ed. 817] (1904); Minor v. Happersett, 21 Wall. 162 [22 L.Ed. 627] (1875). Moreover, Art. I, § 2, is a clear indication that the Framers intended the States to determine the qualifications of their own voters for state offices, because those qualifications were adopted for federal offices unless Congress directs otherwise under Art. I, § 4. It is a plain fact of history that the Framers never imagined that the national Congress would set the qualifications for voters in every election from President to local constable or village alderman. It is obvious that the whole Constitution reserves to the States the power to set voter qualifications in state and local elections, except to the limited extent that the people through constitutional amendments have specifically narrowed the powers of the States."

Of course, State standards regulating the rights of voters in State and local elections are not immune from challenges that they offend federally protected rights. However, the Supreme Court has traditionally exercised restraint in reviewing State legislation creating classifications of voters in order to promote legitimate State interests. The general standard for reviewing State legislation challenged under the Equal Protection Clause is known as the "rational relation" test. The test was defined by Mr. Chief Justice Warren in McGowan v. Maryland, 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393, 399 (1961) as follows:

"Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it."

■ There is no federal constitutional right to vote in State and local elections, and for that reason the Court must test the constitutionality of the residency requirements by application of the "rational relation" test, as did the United States District Court for the Northern District of Ohio in Howe v. Brown, 319 F.Supp. 862, 866 (N.D.Ohio, 1970) in upholding the validity of Ohio's one year residency requirement:

"We find that the one-year residency requirement is not unreasonable, and that it is rationally related to promoting a legitimate state interest. Legitimate state interests that could be promoted by such a requirement are: ensuring that those who vote for state and local representatives are familiar with the political candidates and issues, by having been given maximum exposure to the problems of the locality through the media of local communication; preventing individuals, motivated only by a desire to affect the state's election results, from 'moving' into the state shortly before the election is held, voting, and then returning to their foreign domicile; ensuring that the electors have genuine interests in community affairs. The lines drawn by the distinctions are not infallible, but they need not be, so long as they are rationally related to these interests. McGowan v. Maryland, supra."

Likewise, in Cocanower v. Marston, 318 F.Supp. 402 (D.Ariz.1970), a three-judge court held that Arizona's one year residency requirement for voting in State elections did not violate the Privileges and Immunities Clause and did not abridge the plaintiff's civil right to travel, nor did it deny her Due Process of law.

Much of the thrust behind the assertion that the durational residency statutes impinge upon the right to travel is derived from Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), in which the Supreme Court invalidated a one year residency requirement for receipt of welfare payments. However, we do not regard *Shapiro* as controlling here. In that case the Supreme Court held that the "specific objective" of the residency legislation was to "fence out" poor people who had recently moved within the jurisdiction. The purpose and effect of the legislation was to inhibit the free movement of people who might avail themselves of welfare benefits. Such is not the case here, where the durational residency requirements for voter eligibility cannot realistically be regarded as an attempt to penalize the free movement of voters. We cannot believe that voters are dissuaded or deterred from interstate travel on the basis of the statutes in question.

In Ferguson v. Williams, N.D.Miss. 1971, 330 F.Supp. 1012, 1023, the United States District Court for the Northern District of Mississippi upheld Mississippi's four month registration deadline and stated that:

"Mississippi's registration statutes, previously noted, may be viewed as a valid procedural scheme designed to insure that all qualified citizens vote in the election precincts in which they reside. As conceded, the state has a legitimate interest in requiring some cutoff date for the registration of its voters. Our only inquiry is whether a cutoff time of four months, when measured by the tasks to be performed by the election officials, is arbitrary and unreasonable. Our duty is not to judge the state's requirement in terms of whether it is wise or desirable, but whether 'any state of facts reasonably may be conceived to justify it.' That

Mississippi's registration deadline may be the longest of any state in the Union, and twice as long as any other state, is neither controlling nor persuasive since the Constitution does not require uniformity among the states in the exercise of the state's power to set reasonable, general voter qualifications."

A source of difficulty in reaching the conclusion, based upon the "rational relation" test, that the statutes in question are valid, is the decision of the Supreme Court in Kramer v. Union Free School District No. 15, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). That case held that " . . . if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest." 395 U.S. 627, 89 S.Ct. 1890, 23 L.Ed.2d 589. A number of three judge courts have eagerly seized upon the "compelling state interest" rule to strike down state statutes.[5] Since, for the reasons which are set forth hereinafter, *Kramer* is inapposite to the instant case, we will not deal with its progeny.

It should first be noted that *Kramer* does not overrule Pope v. Williams, the viability of which is evidenced by Mr. Justice Black's citation of the latter in Oregon v. Mitchell. Next, it should be noted that in *Kramer*, the aggrieved party agreed " . . . that the States have the power to impose reasonable citizenship, age, and residency requirements on the availability of the ballot". 395 U.S. 621, 625, 89 S.Ct. 1886, 1889, 23 L.Ed.2d 583, 588. Basically, however, the reason that *Kramer* is not applicable in the instant case is that, in spite of the broad scope of some of its language, its facts are readily distinguishable from those before this Court. In *Kramer*, the

---

5. Blumstein v. Ellington, M.D.Tenn.1970, 337 F.Supp. 323; Kohn v. Davis, 320 F. Supp. 246 (D.Ver.1970); Hadnott v. Amos, 320 F.Supp. 107 (M.D.Ala.1970); Bufford v. Holton, 319 F.Supp. 843 (E.D. Va.1970); Lester v. Board of Elections for District of Columbia, 319 F.Supp. 505 (D.C.1970); Affeldt v. Whitcomb, 319 F.Supp. 69 (N.D.Ind.1970); Burg v. Canniffe, 315 F.Supp. 380 (D.Mass.1970).

New York statute under attack restricted the franchise in certain school district elections to owners or lessees of taxable realty (or their spouses) and to parents or guardians of children in public schools. Mr. Kramer was a bachelor and owned no taxable property and was therefore denied the vote. He was *permanently* disfranchised and there was no way (other than purchasing taxable property, or pursuing the perhaps more difficult route of marrying and becoming a father of a child who would attend public school) that he could become a voter. Thus, Mr. Kramer was *denied* the franchise, and the denial was on a fixed and relatively permanent basis. He was "fenced out". This situation, in the Court's opinion, is easily distinguishable from the residency requirements in the instant case.

It is the Court's opinion, therefore, that the instant case is governed by Pope v. Williams and that, unless and until the Supreme Court rules that residency requirements such as Louisiana's must be struck down under the "compelling state interest" test, we hold that LSA–R.S. 18:270.202 is valid.

Although we have found no cases on the subject of the propriety of a state law temporarily suspending voter eligibility upon change of party affiliation, it is our opinion that, under the rule of Pope v. Williams and the applicable test of constitutionality, there is a reasonable relation between the terms of LSA–R.S. 270.-204 and the State's interest in protecting the integrity of political parties within the State.

For all of the foregoing reasons the relief sought by plaintiffs is denied and their petition should therefore be dismissed.

JACK M. GORDON, District Judge (concurring):

I fully concur in the views expressed in the majority opinion. Because of the importance of the issues before the Court, and because of the observations made by the dissenting Judge, I feel constrained to clarify and further express my own views.

With regard to the issue concerning the validity of the Louisiana statute requiring durational residence requirements before being eligible to vote in a state election, one is confronted, as both the majority opinion and the dissenting opinion describe, with an imposing array of Three Judge District Court decisions on both sides of the issue. A common thread of legal theory runs through all of the cases which have held such durational residence requirements to be invalid as a violation of the Equal Protection Clause of the Constitution. That thread is the thought that specific expressions of the Supreme Court upholding durational residence requirements such as those cited in the majority opinion, and the Supreme Court's *per curiam* affirmation of Drueding v. Devlin, 234 F. Supp. 721 (Md.1964), aff'd, 380 U.S. 125, 85 S.Ct. 807, 13 L.Ed.2d 792 (1965), all took place prior to the "age of enlightenment" which was ushered in by the case of Kramer v. Union Free School District No. 15, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) and the adoption of the so-called "compelling interest" test. Indeed, although the Supreme Court has never specifically made applicable to durational residency requirements the so-called compelling interest test, it has applied the test in a number of other cases involving state statutes which restricted certain classes of individuals from voting.

Thus, but for certain recent Supreme Court decisions, one might argue that the Supreme Court had intended to make the compelling interest test applicable in any case involving state statutes in respect to voting, including durational residence requirements. I respectfully submit, however, that this position is no longer tenable following the Supreme Court's decision in Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970). Although this decision did not directly involve the constitutionality of state statutes and five separate opinions must be studied in order to glean the Supreme Court's disposition with regard to the matter then before it (the validity

of the Voting Rights Act Amendments of 1970), I feel that it is clear from that decision that a majority of the Supreme Court would permit a state to enact reasonable durational residence requirements as a prerequisite to voting in state elections, without the necessity of showin a compelling interest to support such a requirement. As Mr. Justice Black stated in an opinion expressing his own view of the cases, and announcing the judgments of the Court:

It is obvious that the whole Constitution reserves to the States the power to set voter qualifications in state and local elections, except to the limited extent that the people through constitutional amendments have specifically narrowed the powers of the States. Amendments Fourteen, Fifteen, Nineteen, and Twenty-four, each of which has assumed that the States had general supervisory power over state elections, are examples of express limitations on the power of the States to govern themselves. And the Equal Protection Clause of the Fourteenth Amendment was never intended to destroy the States' power to govern themselves, making the Nineteenth and Twenty-fourth Amendments superfluous. My Brother BRENNAN's opinion, if carried to its logical conclusion, would, under the guise of insuring equal protection, blot out all state power, leaving the 50 States little more than impotent figureheads. In interpreting what the Fourteenth Amendment means, the Equal Protection Clause should not be stretched to nullify the States' powers over elections which they had before the Constitution was adopted and which they have retained throughout our history. 400 U.S. 112, 125–126, 91 S.Ct. 260, 265, 27 L.Ed.2d 272.

It is clear to me that the portion of Mr. Justice Brennan's dissenting opinion to which Mr. Justice Black had reference in the foregoing quotation is that portion of Mr. Justice Brennan's opinion asserting that in cases involving exclusion from the franchise the court must determine whether the exclusions are necessary to promote a compelling state interest. More specifically, the dissenting opinion of Mr. Justice Brennan, joined in by Mr. Justices White and Marshall, stated:

The right to vote has long been recognized as a "fundamental political right, because preservative of all rights." Yick Wo v. Hopkins, 118 U.S. 356, 370 [6 S.Ct. 1064, 1071, 30 L.Ed. 220] (1886); see Reynolds v. Sims, 377 U.S. 533, 562 [84 S.Ct. 1362, 1381, 12 L.Ed.2d 506] (1964); Williams v. Rhodes, 393 U.S. 23, 31 [89 S.Ct. 5, 10, 21 L.Ed.2d 24] (1968). "Any unjustified discrimination in determining who may participate in political affairs . . . undermines the legitimacy of representative government." Kramer v. Union [Free] School District, 395 U.S. at 626 [89 S.Ct., at 1889]. Consequently, when exclusions from the franchise are challenged as violating the Equal Protection Clause, judicial scrutiny is not confined to the question whether the exclusion may reasonably be thought to further a permissible interest of the State. Cf. Metropolitan Cas. Ins. Co. v. Brownell, 294 U.S. 580, 583–584 [55 S.Ct. 538, 539–540, 79 L. Ed. 1070] (1935). "A more exacting standard obtains." Kramer v. Union [Free] School District, 395 U.S. at 633 [89 S.Ct., at 1892]. In such cases, "the Court must determine whether the exclusions are necessary to promote a compelling state interest." Id. at 627 [89 S.Ct., at 1890]; Cipriano v. City of Houma, 395 U.S. 701, 704 [89 S.Ct. 1897, 1899, 23 L.Ed.2d 647] (1969). 400 U.S. 112, 241–242, 91 S.Ct. 260, 323, 27 L.Ed.2d 272.

I believe that this language of Mr. Justice Brennan's dissent succinctly summarizes the theory adopted by those three judge cases which have held durational residency requirements to be invalid, and the position set forth by the dissenting Judge in this case. Indeed, the accuracy of Mr. Justice Black's observation concerning the effect of carrying the compelling interest test to its logical conclusion is demonstrated

graphically by the recognition in the dissenting opinion herein that " . . . to carry the 'interest' theory so far as to franchise Alaskans in Louisiana would be, in effect, to eliminate the whole notion of state citizenship and, in large measure, to do away with our federal system of government."

I believe that the right of a state to establish a reasonable durational residency requirement is extremely analogous, if not identical, to the right of a state to establish voting ages. In regard to the right of a state to establish voting age, Mr. Justice Stewart, in his opinion in Oregon v. Mitchell, *supra,* stated:

Indeed, none of the opinions filed today suggest that the States have anything but a constitutionally unimpeachable interest in establishing some age qualification as such. Yet to test the power to establish an age qualification by the "compelling interest" standard is really to deny a State any choice at all, because no State could demonstrate a "compelling interest" in drawing the line with respect to age at one point rather than another. Obviously, the power to establish an age qualification must carry with it the power to choose 21 as a reasonable voting age, as the vast majority of the States have done. 400 U.S. 112, 294–295, 91 S.Ct. 260, 349, 27 L.Ed.2d 272.

There can be no clearer expression of the onerous effect of subjecting a state to the necessity of justifying a statute under the compelling interest test, as many have sought to apply that test.

If a state may decide that its inhabitants are incapable of exercising the franchise until they have reached a certain age, then I believe that a state likewise may decide that certain residents should not exercise the franchise until they have fulfilled some minimal durational residency requirement, so as to become acquainted with the state's affairs, and to deter fraudulent migration for the purpose of maintaining the integrity of the election process. If, however, this Court were to adopt the compelling interest test, and apply such

test as it has been asked to do, then the Court would be required to strike down all durational residence requirements except those which the state could discharge the burden of proving a compelling interest in maintaining. I doubt that a state could discharge this burden for any period of time, except perhaps for the period of time required in order to carry out the logistical registration processes, and these undoubtedly would vary from locality to locality, even within a state.

In this regard, although our dissenting Brother would have us adopt the compelling interest test, he is not willing to accept the consequences thereof. Notwithstanding the fact that the State in this case has demonstrated no compelling interest for any period of time, the dissent would allow the State to maintain the shortest of the durational requirements which it has established as a means of deterring fraudulent migration. It is significant, I believe, that in reaching this conclusion the dissenting Judge acknowledges the validity of the reasoning of Mr. Justice Stewart in Oregon v. Mitchell, *supra,* quoted above, that we cannot acknowledge the right of the State with one hand then take it away with the other by requiring the State to justify the specific duration it has selected. In my opinion this is equivalent to saying that the compelling interest test, as generally interpreted, cannot be applied if a state has the right to select *any* durational requirement.

I respectfully submit that it is unnecessary to attempt to rationalize the question of whether a State voting statute is violative of the Equal Protection Clause of the Constitution by ascribing such great weight as that which some feel to have become attached to the so-called compelling interest test. To do so only invites the logical conclusion about which Mr. Justice Black warned us. I believe that a more proper approach to *Kramer,* and its progeny, is not that a State must justify every statutory exclusion in the voting area in state elections as meeting a compelling interest of the

state, but rather that those exclusions which fall in the category of "invidious discrimination" as defined by the Supreme Court in its cases interpreting the Equal Protection Clause [1] may only be sustained by the state if the state can show a compelling interest for such discrimination.

In those cases involving voting in which the Supreme Court heretofore has applied the compelling interest test,[2] the discrimination complained of permanently excluded certain classes from voting, and there was ample justification to treat such discrimination as "invidious" within the holdings of such cases as McGowan v. State of Maryland, *supra*. It is very doubtful whether a state could under any circumstances justify this type of discrimination as meeting a compelling interest.

I do not consider a reasonable durational residence requirement (so temporary in nature that most plaintiffs have great difficulty securing final adjudication of their cases before mootness occurs by expiration of the duration) to be such invidious discrimination as would require the application of this exacting test, and I do not believe the Supreme Court has so treated it. Indeed, I believe that the Supreme Court in Oregon v. Mitchell, *supra*, and in the very recent case of Gordon v. Lance, 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971), has placed in proper perspective the application of its recent cases interpreting the Equal Protection Clause, and has given ample guidance to District Courts in disposing of issues such as that now before us. It is not, I submit, a proper function of a District Court to substitute its judgment for that of a State's legislature on the establishment of voting qualifications which the Constitution has reserved for such legislature. Neither

should a District Court interpret the Equal Protection Clause in such fashion as to substitute therefor a test which would, as stated by Mr. Justice Black, "blot out all state power, leaving the 50 states little more than impotent figureheads." Oregon v. Mitchell, 400 U.S. at 126, 91 S.Ct. at 265. In this regard Mr. Justice Harlan's comments in Oregon v. Mitchell, *supra*, are, I think, most pertinent. He said:

The judiciary has long been entrusted with the task of applying the Constitution in changing circumstances, and as conditions change the Constitution in a sense changes as well. But when the Court gives the language of the Constitution an unforeseen application, it does so, whether explicitly or implicitly, in the name of some underlying purpose of the Framers. This is necessarily so; the federal judiciary, which by express constitutional provision is appointed for life, and therefore cannot be held responsible by the electorate, has no inherent general authority to establish the norms for the rest of society. It is limited to elaboration and application of the precepts ordained in the Constitution by the political representatives of the people. When the Court disregards the express intent and understanding of the Framers, it has invaded the realm of the political process to which the amending power was committed, and it has violated the constitutional structure which it is its highest duty to protect.

\* \* \* \* \* \*

Judicial deference is based, not on relative factfinding competence, but on due regard for the decision of the body constitutionally appointed to decide. Establishment of voting qualifications is a matter for state legislatures. As-

---

1. See, McGowan v. State of Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); Williamson v. Lee Optical, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

2. Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d

583 (1969); Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); City of Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970).

suming any authority at all, only when the Court can say with some confidence that the legislature has demonstrably erred in adjusting the competing interests is it justified in striking down the legislative judgment. This order of things is more efficient and more congenial to our system and, in my judgment, much more likely to achieve satisfactory results than one in which the Court has a free hand to replace state legislative judgments with its own. 400 U.S. 112, 202–203, 207, 91 S.Ct. 260, 304, 27 L.Ed.2d 272. The durational residency requirements imposed by Louisiana are longer than those which I would choose if I were required to exercise discretion as a legislator, in view of many factors, including modern day communications. I do not consider, however, that the exercise of such discretion is the proper function of this Court, nor do I subscribe to any theory which would substitute judicial expediency for legislative wisdom. Since I do not believe the discrimination here attacked to be invidious discrimination, it should not be set aside as violative of the Equal Protection Clause if any state of facts reasonably may be conceived to justify it. This obviously may be done, and indeed the plaintiffs have not attempted to discharge the burden of proving otherwise.

Turning briefly to the second issue raised by the plaintiffs, which the dissenting opinion has described as having been treated in "cavalier" fashion by the majority, I should like to add my views which I think further demonstate the correctness of the majority decision.

In the first place, the fact that certain of the plaintiffs in this lawsuit may not participate in the primary election conducted by the Democrat Party on November 6, 1971, because of their not having changed their registered affiliation from Republican to Democrat more than six months prior to such primary election, as required by Louisiana law, is not, in my opinion, a result of the Louisiana statutory scheme but rather is a result of the action or inaction of such plaintiffs. These plaintiffs have stated no reason other than inconvenience or lack of knowledge of the law to justify their failure to have changed their party affiliation in sufficient time to have permitted them to vote in the November 6, 1971, primary of the Democrat Party as contemplated by Louisiana law. Under these circumstances I am at a loss to understand how the plaintiffs can contend that they have been denied equal protection of the laws.

They have, in an attempt to bring their case within the purview of the Equal Protection Clause, asserted that the State discriminates between voters who change their registration from one political party to another and those who change their registration from "Independent" to that of a political party. In the latter case, under the Louisiana election laws, a person may participate in the primary election of his new party without the six month waiting period. When one considers the entire statutory scheme of the Louisiana election laws as set forth in Title 18 of the Louisiana Revised Statutes, it is, I believe, abundantly clear why Louisiana would wish to maintain the integrity of its political parties by providing such a waiting period for those wishing to change from one party to another. The same reasoning obviously would not apply to individuals registered as "Independent" since they presumably would have no loyalty to any party until such time as they chose to affiliate with it. A review of the Louisiana election laws reveals that this is entirely consistent with other distinctions or discriminations contained in such laws. For example, those registered "Independent" have the right to cause candidates to be placed on the general election ballot by petition of persons similarly registered. This privilege is not enjoyed by those who are registered as affiliated with a political party. La. Rev.Stat. 18:624.

Under the statutory scheme of the Louisiana election laws the political parties are vested with great responsibilities which are vitally important in the

conduct of elections. The executive committees of the political parties are required to call elections, name commissioners, certify candidates, and in almost all other respects conduct the logistical affairs related to elections. The mischief which could be done by allowing promiscuous changeovers from one party to another, particularly in a state like Louisiana which has closed primaries, and which has one very predominant party, are too obvious to require delineation.

WISDOM, Circuit Judge (dissenting):

At the time the Founding Fathers were in Philadelphia debating the extent of a citizen's right of franchise, women, slaves, and indentured servants were denied the franchise. Property qualifications, religious restrictions, and other limitations narrowed the number of eligible male voters. As finally approved, the Constitution contained no guarantee of the right to vote; even senators were chosen by state legislatures. In 1875 when the Supreme Court decided Minor v. Happersett, 21 Wall. 162, 22 L.Ed. 627, on which the majority relies for its basic rationale, women were still denied the right of franchise, Negro men were just learning to vote, and property qualifications for voting were common throughout the States. When the Court decided Pope v. Williams, 193 U.S. 621, 24 S.Ct. 573, 48 L.Ed. 817, in 1904 women still could not vote, blacks in Southern states had been disfranchised by various voting "qualifications",[1] property requirements were in effect in many types of elections, and the poll tax had the approval of the courts.

Today, however, the right to vote is central to our constitutional system, "a fundamental matter in a free and democratic society". Reynolds v. Sims, 1964, 377 U.S. 533, 561, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506. I would characterize it not as privilege but as right inherent in national citizenship conferred on every citizen by the Fourteenth Amendment. States have the power to impose fair and reasonable voting qualifications but where "fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined". Harper v. Virginia State Board of Elections, 1966, 383 U.S. 663, 670, 86 S.Ct. 1079, 1083, 16 L.Ed.2d 169.

Recently, in Kramer v. Union Free School District, 1969, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583, the Supreme Court stated that "if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, *the Court must determine whether the exclusions are necessary to promote a compelling state interest*". The Supreme Court, speaking through Chief

---

1. The power of the states to fix qualifications for voters' registration enabled Louisiana to reduce the number of registered Negroes from 130,344 in 1897 (as against 164,088 whites) to 1,342 in 1904, the year the Supreme Court decided Pope v. Williams. Reports of the Secretary of State. See United States v. State of Louisiana, E.D.La.1963, 225 F. Supp. 353, 370–375. In 1897 in Williams v. Mississippi, 170 U.S. 213, 18 S.Ct. 583, 42 L.Ed. 1012, the Supreme Court upheld the validity of the "understanding clause" as a "qualification". The Louisiana Constitution of 1898, Article 197 invented the "grandfather clause" as a more palatable fraud on the franchise than the "understanding clause".

Times change. The scope of the principles that enabled the Founding Father to convert a league of friendly sovereignties into "an indestructible Union . . of indestructible states" (Chase: Texas v. White, 7 Wall. 700, 725, 19 L.Ed. 227) must vary with changing times. No one has said this better than Holmes: "The provisions of the Constitution are not mathematical formulas having their essence in their form; they are organic, living institutions transplanted from English soil. Their significance is vital, not formal; it is to be gathered not simply by taking the words and a dictionary, but by considering their origin and the line of their growth." Gompers v. United States, 233 U.S. 604, 610, 34 S.Ct. 693, 695, 58 L.Ed. 1115.

Justice Warren, explained why the Court would not apply the "general presumption of constitutionality afforded state statutes" when reviewing statutes which deny some residents of a state the right to vote.

> The presumption of constitutionality and the approval given "rational" classifications in other types of enactments are based on an assumption that the institutions of state government are structured so as to represent fairly all the people. However, when the challenge to the statute is in effect a challenge of this basic assumption, the assumption can no longer serve as a basis for presuming constitutionality.

*Kramer, supra,* at 395 U.S. 628, 89 S.Ct. 1890, 23 L.Ed.2d 590.

Since the landmark decision in *Kramer,* nine three-judge courts have invalidated durational residency voting requirements ranging from three months to one year by invoking the compelling interest standard under the Equal Protection Clause. Burg v. Canniffe, D.Mass.1970, 315 F.Supp. 380; Affeldt v. Whitcomb, N.D.Ind.1970, 319 F.Supp. 69; Lester v. Board of Elections for District of Columbia, D.D.C.1970, 319 F.Supp. 505; Bufford v. Holton, E.D.Va.1970, 319 F. Supp. 843; Hadnott v. Amos, M.D.Ala. 1970, 320 F.Supp. 107; Kohn v. Davis, D.Vt.1970, 320 F.Supp. 246; Keppel v. Donovan, D.Minn.1970, 326 F.Supp. 15; Blumstein v. Ellington, M.D.Tenn. 1970, 337 F.Supp. 323; Andrews v. Cody, M.D.N.C.1971, 327 F.Supp. 793. Seven of those cases are now on appeal to the United States Supreme Court. Since *Kramer,* five district courts have upheld durational residency requirements under the rational relation standard. Howe v. Brown, N.D.Ohio 1970, 319 F.Supp. 862; Ferguson v. Williams, N.D.Miss.1971, 330 F.Supp. 1012; Cocanower v. Marston, D.Ariz.1970, 318 F.Supp. 402, appeal filed 10–3–70, 40 L.W. 3022; Fitzpatrick v. Board of Election Commissioners, N.D.Ill.1970, 39 L.W. 2356, appeal filed 2–12–71, 40 L.W. 3023; Piliavin v. Hoel, W.D.Wis.1970, 320 F.Supp. 66.

In my opinion, none of the cases holding that the rational relation test should apply to durational residency requirements have succeeded in explaining the crucial proposition which they must explain if their reasoning is to be taken as reliable precedent. None of the cases provides any cogent rationale to support its conclusion that there are two classes of voter eligibility standards: those which must be examined by the compelling interest test under the Equal Protection Clause and those which need be tested only by the rational relation standard. It may be that somewhere in the legal firmament there is a shining star to guide the Supreme Court in distinguishing some voter eligibility standards from others to which it has unequivocally applied the compelling interest test. *Kramer, supra;* Cipriano v. City of Houma, 1969, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647; City of Phoenix v. Kolodzieyski, 1970, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523. But in the present case I am unable to discern even a flickering gleam of a twinkle which might help to explain the majority's decision to apply the rational relation test to both the Louisiana voter eligibility standards under attack today.

I. *Compelling Interest Test Should Apply to Durational Residency Re-Requirement.*

At the outset, it might be well to define precisely the framework within which this court must choose between the compelling interest and rational relation tests. Louisiana's election statutes distribute the franchise selectively between two classes of citizens. On the one hand, there is the class of citizens who have lived within the state for one year, the parish for six months, the municipality for four months, and the precinct for 90 days. Those citizens may vote. On the other hand, there is a class of citizens who have not fulfilled the various durational residency require-

ments, and they may not vote.[2] Neither party to this lawsuit denies that two classes are created. What is really in dispute is whether the state will be required to come forward with strong proof of its need for creating the two disparately treated classes—as the state would be required to do under the compelling interest test.

Any standard for measuring the eligibility of voters creates two classes—those whom the standard allows to vote, and those whom it disqualifies. It is the creation of the disparately created classes which triggers the court's scrutiny under the Equal Protection Clause. I should like to stress at the outset, as well as below, that the degree of scrutiny required of any particular voter eligibility standard is not explained or rationalized by simply attaching to that standard the term "qualification" or "initial qualification" for voting, as purportedly distinguished from a "disfranchisement", a "fencing out", or a "deprivation of the franchise" occurring "after" a voter is "initially qualified" to vote. (For an example of this approach, see Howe v. Brown, N.D.Ohio 1970, 319 F. Supp. 862, 866.) This conclusory terminology fails to provide any principle which distinguishes an "initial qualification" from a "disfranchisement". The key inquiry is to determine whether a coherent principle of distinction can be articulated, and it is no answer to attach a set of labels which support a particular result without any hint of the reasoned underpinnings of the alleged distinction.

The Court today says that the rational relation standard is appropriate notwithstanding the Supreme Court's straightforward statement in 1969 that "if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest". Kramer v. Union Free School District, 1969, 395 U.S. 621, 626–627, 89 S.Ct. 1886, 1889–1890, 23 L.Ed.2d 583. The plaintiffs here are all bona fide residents of requisite age and citizenship, and they cannot vote in this November's statewide primary elections in Louisiana. But the majority assures us that Kramer does not apply to the facts of this case and offers several justifications for refusing to follow the explicit language of Kramer. In my opinion, none of these justifications will stand up to careful analysis, and none is responsive to the crucial question presented today: what distinguishes those voter eligibility standards which need be measured by the compelling interest test from those which need not?

a) "Voting in a state election is a privilege and not a right."

The majority tells us that "the underlying concept in this case" is that "a resident of a state does not have a right

2. A registrant is not technically deprived of the franchise in statewide elections if he moves from one parish to another. See La.Rev.Stat. 18:270.606(B). He must, however, return to the parish from which he has removed for the purpose of voting in statewide elections. Practically, this provision serves to disfranchise many voters who have not fulfilled the six month parish residency requirement. See my discussion of this provision at part II below.

By an amendment of 270.606(A) enacted in 1970, the registrant who has removed does retain the right to vote in his former precinct for three months following his removal. This unusual provision apparently compensates the new-comer for his disfranchisement in his new home by allowing him to continue voting in the precinct where he no longer resides, while he waits out the durational residency requirement for voting in the new precinct.

In short, I think it is fair to say that the durational residency requirements imposed by Louisiana have the practical effect of entirely cutting off many Louisianans from the political affairs which concern them for six months after they move from one part of their state to another. And those who move to Louisiana from another state are unable to vote in Louisiana elections for a full year.

to vote in State elections . . . but a *privilege* to vote". This "concept", for some unexplained reason, leads the majority to conclude that the compelling interest test is inapplicable to this selective distribution of the state franchise.

Whether the citizen has a "right" or a "privilege" to vote in state elections surely cannot end the state's obligation to distribute the franchise in accordance with the dictates of the Equal Protection Clause. Thus the state arguably need not admit any citizen to the "privilege" of voting but once it confers the privilege on some it cannot deny the vote to others on an unconstitutionally discriminatory basis. See Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv.L.Rev. 1439, 1454-55 (1968). This restriction on the state's power is supported not only by common sense, but also by a mountain of precedent. The school desegregation cases involved no more and no less than the application of the Equal Protection Clause to a service which it has never been held the citizen has a "right" to enjoy and the state a duty to provide. Nor is the provision of welfare,[3] recreational facilities,[4] and now even municipal services [5] exempt from the requirements of the Equal Protection Clause.

Perhaps, then, what the Court suggests is that the mere "privilege" status of the ability to vote in state elections means that the courts need be less vigilant in insuring that the state franchise is doled out in accordance with the Equal Protection Clause. See Richardson v. Belcher, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971). Consequently, or so the argument might run, the watered down rational relation test is fit for this occasion. But if this is the majority's

reasoning, it runs head on into the series of cases applying the compelling interest test to the franchise in state and local elections. *Kramer*; *Cipriano*; and *Harper*, supra.

At the least, then, the Court's reliance on the right-privilege distinction as support for its use of the lax rational relation test is unexplained and directly contrary to a raft of decisions by the Supreme Court of the United States.

b) *"No denial of the franchise on a fixed and relatively permanent basis."*

The majority distinguishes away the recent *Kramer* case because it says that Kramer was denied the right to vote "permanently" and these plaintiffs are subjected to only a "temporary" disfranchisement. Kramer, the majority recalls, had no children and owned no taxable property, and no matter how long he waited, he could never vote in a school district election. In this case, the majority suggests, Fontham and his co-plaintiffs need only sit tight for a short space of time and their disfranchisement will be cured. Though it never says so, I sense that the majority implies that these plaintiffs are subjected to a relatively trifling deprivation, and that it is therefore justifiable to evaluate this deprivation only by means of the permissive, rational relation test.

My first quarrel with this supposed distinction is that it cannot even be derived fairly from the facts of *Kramer* and those of the case at bar. Kramer's disfranchisement was only permanent so long as he refrained from buying taxable property or procreating. He could take either of these steps and gain a voice in school district elections. He was not irrevocably and hopelessly barred from the

---

3. Shapiro v. Thompson, 1969, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600.

4. E. g., Schiro v. Bynum, 1964, 375 U.S. 395, 84 S.Ct. 452, 11 L.Ed.2d 412 (municipal auditorium); New Orleans City Park Improvement Ass'n v. Detiege, 1958, 358 U.S. 54, 79 S.Ct. 99, 3 L.Ed.2d 46, reh. den. 358 U.S. 913, 79 S.Ct. 228, 3

L.Ed.2d 234 (public park and golf courses); Mayor and City Council of Baltimore v. Dawson, 1955, 350 U.S. 877, 76 S.Ct. 133, 100 L.Ed. 774 (public beaches and bathhouses).

5. Hawkins v. Town of Shaw, Mississippi, 5 Cir. 1971, 437 F.2d 1286.

franchise as he might have been had the determining factor been the color of his skin or his sex. Still, in *Kramer* the Supreme Court viewed the disfranchisement, however conditional or curable, as a serious deprivation of the crucial right to participate in our democracy—a deprivation serious enough to invoke the compelling interest test. The case before us presents if anything a *stronger* claim for application of the compelling interest test, assuming that the criterion for choosing that test is the seriousness of a deprivation as measured by the citizen's practical inability to end the deprivation on his own initiative. In this case, there is absolutely nothing the plaintiffs can do to get into the electoral fray—nothing but sit on the sidelines and watch the contest decided without their participation.

If the majority has in mind the duration of a deprivation, *per se*, as a measure of its seriousness, in applying that test to electoral politics they have chosen a most inapt proving ground for their theory. Suffice it to say that political rights are as ephemeral as any which our system of government protects, with the possible exception of the First Amendment rights to which they are closely allied. The outcome of the November 6, 1971, party primaries in Louisiana may influence the future of this state for years to come. To cite but a single specific example, those Democrats nominated for state office on November 6 will, if history is any indication, have a strong chance of gaining election in the general election which follows. And those elected to state offices during this election year will have great influence in choosing those who will succeed to office in 1976, while those chosen in 1976 will have great influence on those who follow them. Of course, no voter ever comes to the electoral process free of the pressures exerted by previous voters in previous elections. But a temporary disfranchisement is still a deprivation of the utmost seriousness, one which I am unwilling to take so lightly as my broth-

ers do, and one which I think is fully worthy of strong justification by the state.

Since this "permanent-temporary" distinction of *Kramer* is, then, tenuous to say the least, the majority must fall back on the vague dictum in *Kramer* "that the States have the power to impose reasonable citizenship, age, and residency requirements on the availability of the ballot." Lawyers and judges can argue all day long about the meaning of phrases like the one which the majority quotes, and the arguments are impossible to resolve in the absence of underlying concrete controversy to support the pronouncement sought to be interpreted. I will note only that the dictum says nothing of *durational* residency requirements and that it too, fails to articulate a coherent principle which would distinguish these voting prerequisites from those to which the active Equal Protection review applies. Other language in Kramer invokes the compelling state interest test when the state restricts the franchise beyond age, citizenship, and mere bona fide residence. If anything, Pope v. Williams, relied on so heavily by the majority and discussed below, suggests that the dictum from *Kramer*, refers only to bona fide residency and not to duration, for *Pope* itself did not deal with durational residency.

In any event, these trifling disagreements over words of dictum cannot mask the crucial failure of the majority opinion to explain in any defensible fashion its decision to ignore the strong precedent in *Kramer* for applying a compelling interest test to cases involving voter eligibility standards.

c) *"Pope v. Williams controls the present case."*

In the 1904 case of Pope v. Williams, 193 U.S. 621, 24 S.Ct. 573, 48 L.Ed. 817, the Supreme Court upheld a Maryland statute requiring newcomers to make a declaration of their intent to remain and become residents of Maryland as a pre-

requisite to voting registration. I am surprised to discover that the present case—involving durational residency requirements—is controlled by Pope v. Williams. All *Pope* holds is that a state may require voters in its elections to be residents of the state, that is, domiciliaries who have both physical presence and an intention to remain. Thus a man who lives in Virginia has no constitutional right to cross the Potomac and vote in Maryland; and an Alaskan has no constitutional right to vote in Louisiana. That is hardly a startling proposition, and the plaintiffs in the present case conceded it in the first sentence of their oral argument. Indeed, as the language quoted by the majority makes clear, *Pope* itself acknowledged that "the privilege to vote in a state is within the jurisdiction of the state itself . . . *provided, of course, no discrimination is made between individuals, in violation of the Federal Constitution.*" 193 U.S. 621, 24 S.Ct. 573, 48 L.Ed. 817 (emphasis supplied). *Pope* supplies little guidance as to the proper standard for resolving the question of whether a discrimination between individuals exists which violates the Constitution.

In fact, I believe that Pope v. Williams can be squared with the compelling interest test. The Maryland statute in *Pope* created two classes of citizens: those who were transients in Maryland and who could not vote there; and those who resided in Maryland and who were given the franchise. An oath of intention to reside is an effective and fair way of defending the state's compelling interest in insuring that the individuals who make its electoral decisions have a substantial stake in the outcome of those decisions. Moreover, it is a necessary means of insuring bona fide residency, because any alternative system—for example, state conducted investigations of the residency of registrants—would be far more intrusive and restrictive.

I recognize that the electoral decisions of a state may have substantial impact on the citizens of sister states, much as

a school bond election may have impact on non-parents, see Kramer v. Union Free School District, *supra.* But to carry the "interest" theory so far as to franchise Alaskans in Louisiana would be, in effect, to eliminate the whole notion of state citizenship and, in large measure, to do away with our federal system of government. In short, Pope v. Williams, though decided long before the dawning of the age of equal protection on facts nothing like those before us, is consistent with the compelling interest test, even as that test has limited voter eligibility standards based on a supposed lack of "interest" in voting in the recent cases of *Kramer* and *Cipriano.*

d) *"The United States Supreme Court has held that age, literacy, and lack of a previous criminal record are permissible conditions of state suffrage."*

i) *Age.* Citing Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1971), the majority today finds support for its decision to apply a rational relation test to both the Louisiana election statutes before us. Oregon v. Mitchell struck down Congressional action designed to alter from 21 to 18 state minimum requirements for voting age arguably violative of the Equal Protection Clause. The case plainly compels the conclusion that the states do not violate the Equal Protection Clause when they require voters to be twenty-one years of age; if there were a violation, Congress could not be denied the right to eliminate it through its powers under Section 5 of the Fourteenth Amendment.

Again, though, the Court's analysis stops short of the mark. To say that the states may require voters to be 21 years old without offense to the Equal Protection Clause is not necessarily to say that the states' rights to impose an age minimum of some kind is to be tested by the rational relation standard. I think the better, and more consistent, view is that an age requirement of some kind is necessary to protect the state's com-

pelling interest in insuring that its voters are informed enough to understand the issues before them and mature enough to weigh those issues seriously. Few would deny, I think, that the states would be promoting such a compelling interest if they limited the franchise to persons 10 years of age or more. The difficulty is that, having recognized the state's compelling interest in imposing *some* age minimum, a court cannot require the state to justify affirmatively any *specific* age minimum without altogether eliminating the state's right to impose any minimum in the first place.

> [T]o test the power to establish an age qualification by the "compelling interest" standard is really to deny a State any choice at all, because no State could demonstrate a "compelling interest" in drawing the line with respect to age at one point rather than another. Oregon v. Mitchell, supra, Stewart, J., concurring and dissenting.

In other words, the states need only show a reasonable justification for the exact age limit they have selected because a stiffer burden of justification would deprive them of their plainly compelling need to establish some age minimum. Oregon v. Mitchell does not lead me to conclude that age minima are a special type of voting limitation which are to be tested from the outset only by the lax rational relation test.

I recognize that there is language in Mr. Justice Black's opinion which strongly implies disapproval of Mr. Justice Brennan's suggestion that the compelling interest test be applied uniformly to all exclusions from the franchise. Again, though, I find not a hint of a principle which would enable me to determine 1) what are the defining characteristics of the category of voter eligibility standards which, like the age minimum, are to be tested by the rational relation standard; and 2) whether Louisiana's durational residency requirement possesses those characteristics or not. Indeed, with all respect, I feel compelled to say

that Mr. Justice Black's opinion provides no more guidance than does the "initial qualification" versus "fencing out" terminology set forth without elaboration by some district courts. See note 1, *supra*. Because I have not yet discovered the principle which Mr. Justice Black's opinion fails to elaborate, it seems to me more promising to treat his opinion as consistent with the Court's previous recent expressions of the appropriate test for determining the constitutionality of exclusions from the franchise. And that is the course which I would take.

ii) *Literacy.* In Lassiter v. Northampton County Bd. of Elections, 1959, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072, the Supreme Court upheld an English language literacy requirement imposed by North Carolina. The Court concluded that "the ability to read and write . . . has some relation to standards designed to promote intelligent use of the ballot." 360 U.S. at 51, 79 S.Ct. at 990, 3 L.Ed.2d at 1077.

While I do not deny that Lassiter applied the equivalent of a rational relation test to a state statute of selective disfranchisement, I have serious doubts that *Lassiter's* rationale is still sound in the aftermath of *Harper, Kramer,* and *Cipriano.* In 1959, the application of the compelling interest test to voting was still at least five years away, since it was not until Reynolds v. Sims, 1964, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, that voting was explicitly elevated into the pantheon of "fundamental interests". Recently, the California Supreme Court, in an excellent opinion by Justice Sullivan, has taken a backward glance at *Lassiter* and concluded, as I do, that the Supreme Court would now evaluate California's English literacy requirement under the compelling interest test. Castro v. California, 1970, 2 Cal.3d 223, 466 P.2d 244, 251–253. The court discusses *Harper, Kramer,* and *Cipriano,* and points out the significant omission of literacy from the *Kramer* statement that "if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and de-

nies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest." 395 U.S. 621, 626–627, 89 S.Ct. 1886, 1889–1890.

The omission of literacy from this list of requirements is significant. Previously, in cataloging permissible state grounds for voter disqualification, the court had included literacy along with age, citizenship and residence. The inference seems inescapable that statutes imposing literacy requirements are among those to which courts must apply the analysis indicated in *Kramer*.

Once again, then, close analysis does not indicate that the case cited by the majority is vital authority for the application of the permissive Equal Protection standard in this case.

### iii) *Previous criminal conviction.*

Davis v. Beason, 1890, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637 and its progeny upholding disfranchisement of convicted felons provide scant support for application of the rational relation test to these Louisiana statutes. Those cases are intimately bound up with a state's freedom to administer its criminal laws. Deprivation of the franchise based upon a criminal record is a form of punishment and a form of deterrent, however imprecise and however ill conceived. Like most deterrents, it sweeps broadly and disfranchises many reformed felons who undoubtedly would be a credit to 1 the electorate. But I do not think it has ever seriously been advanced that the Equal Protection Clause requires the states to provide compelling justifications for the "discriminations" they create by their criminal punishments. Requiring the state to show compelling justification for disfranchisement of felons would lead inevitably to the same degree of justification being required for the establishment of different jail sentences for different crimes. The problem of applying equal protection analysis to criminal punition is *sui generis*, and has

no proper place in the consideration of this straightforward voting rights case.

e) *"The state need only justify those exclusions from the franchise which result from 'invidious discriminations.'"*

The concurring judge would distinguish *Kramer* and its progeny on the ground that those cases involved disfranchisements of an invidious nature which a durational residency requirement does not entail. Both the majority and concurring opinions seem to equate "invidious" with "severe", and "severe" with "longlasting". I have already indicated why I cannot accept that pair of equations, at least not in the context of electoral politics.

The concurring opinion also cites a Supreme Court decision of last term as authority for the position that an invidious discrimination is required to trigger the compelling interest test in voting cases. In Gordon v. Lance, 1971, 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273, the Court, in an opinion written by the Chief Justice, upheld a West Virginia constitutional requirement that sixty percent of all registered voters in a political subdivision approve any bonded indebtedness or any increase in tax rates beyond those established in the State Constitution. The Court, apparently applying the rational relation test, described *Cipriano* as "no more than a reassertion of the principle, consistently recognized, that an individual may not be denied access to the ballot because of some extraneous condition, such as race . . . ; wealth . . . ; or military status". 403 U.S. 5, 91 S.Ct. 1891 (citations omitted). The Court went on to say that the West Virginia Constitution "singles out no 'discrete and insular minority' for special treatment;" that there was no "independently identifiable group" that favored bonded indebtedness or increases in the tax rate and that would have been prejudiced by the Constitutional provision; and, finally, that "no sector of the population may be said to be 'fenced out'

from the franchise because of the way they will vote." *Id.*

The persons disfranchised by these Louisiana statutes—newcomers to the state—are not a coherent group with a demonstrable commitment to a specifiable voting position. The are, however, a "discrete and insular minority" because they are a relatively small group of bona fide Louisiana residents of requisite age and citizenship who are "fenced out" of the franchise this November. The Supreme Court has never held that a group disfranchised by a voter eligibility standard, in order to put the state to the burden of justifying the standard by a compelling showing, had to demonstrate its political, ethnic, or economic cohesiveness. Surely this is not the teaching of either *Kramer* or *Cipriano*, unless one views "tax status" as equivalent to wealth, and thereby places *Kramer* and *Cipriano* on the Procrustean bed of *Harper*, the poll tax case. There was no emphasis in *Kramer* and *Cipriano* upon the speculative possibility that the non-property owners disfranchised in those cases were an identifiable class who favored bonding issues because it might not cost members of the class additional tax dollars to service those bonds. In both cases, the state argued vehemently that the disfranchised class simply lacked a stake in the community sufficient to afford its members a genuine "interest" in the outcome. The Court held that the disfranchised class did have the requisite "interest" and had to be given the right to vote. Nowhere did the Court intimate that its holding was motivated by concern that a particular identifiable minority group was being deprived of the ballot.

The "identifiable insular minority" principle of Gordon v. Lance,—insofar as it looks to predictable voting tendencies or political or economic cohesiveness—seems to me a great departure from the purity of the Court's concern with the right to vote which plainly characterized the Court's opinions in *Kramer* and *Cipriano* and led the Court to invoke the compelling interest test in those cases. I think, then, that *Gordon v. Lance* must be taken as a special restriction upon, and not a repudiation of, the earlier landmark cases involving application of the compelling interest test to voter eligibility standards. *Lance* holds that, in the very different circumstance of the greater-than-majority voting requirement,[6] unless the requirement operates to disfranchise an identifiable group the requirement may stand. *Lance* will not support application of the rational relation test to the facts of the case at bar unless we are to assume that the Court in *Lance* placed a restrictive gloss upon the holdings of *Kramer* and *Cipriano* which a fair reading of those cases will not independently support.

To summarize: I believe that all state voter eligibility requirements are to be tested by the compelling interest test. That is the only rule of law which is both coherent and consistent with existing precedent.

## II. Differential Residency Requirement Cannot Stand.

Having decided to apply the compelling interest test to these statutes, I turn to a consideration of the differential durational residency requirement imposed by Louisiana. In order to be allowed to vote, a registrant must be a resident of the

---

6. Were majoritarianism constitutionally prescribed, its ramifications would be profound. If the people acting in referendum may not be subjected to extraordinary majority requirements, presumably legislators acting for the people may not either. Thus extraordinary majority requirements within state legislatures would be unlawful. State constitutions would be reduced to little more than codified statutes, since a simple majority of either the people or their representatives would have to be permitted to change the provisions of the state's fundamental law. The gubernatorial veto would be unconstitutional if the logic of majoritarianism prevailed in full. These are but a few of the unsettling implications of constitutionally-mandated majority rule. In my opinion, they explain why the Court would seek to restrict the application of such a principle, as it did in *Lance*. See Note, 83 Harv.L.Rev. 1911, 1914 n. 20.

state for one year, the parish for six months; the municipality for four months; and the precinct for three months. There are two serious justifications for such a requirement. The first is that it insures the familiarity of the voter with the issues before him through insuring a certain minimum period of exposure to those issues. If, overall, durational residency does in fact promote such an interest, along the way it fences out too many who are well informed (as are these plaintiffs) and enfranchises too many who are less knowledgeable to withstand the test of precision required of the compelling interest test.[7] To protect the state's interest in an informed electorate, a durational residency requirement is simply not precisely enough "tailored" to withstand constitutional scrutiny.

As a device for preventing migratory, fraudulent voting, or colonization, durational residency is a more substantial vehicle. Simply stated, durational residency is a means of insuring that a would-be fraudulent voter does not register in a locale where he does not live, return to his home, and then return on election day to cast his ballot in the locale where he does not live, but where he wishes to influence the election result. The plaintiffs here argue that durational residency does not prevent this fraudulent practice at all, since they say that the would-be fraudulent voter can falsely swear that he has been a resident for the requisite period of time, and that false swearing would be no obstacle to one intent on fraud. See the argument to the same effect in Affeldt v. Whitcomb, D.Ind.1970, 319 F.Supp. 69, 77.

Whatever one makes of that argument, in Louisiana, Revised Statute 18:37 has been interpreted to give a registrar the

power to require a prospective registrant to supply both proof of identity and proof of length of residency. See the description of this procedure in Davis v. Gallinghouse, E.D.La.1965, 246 F.Supp. 208, 212. Often the registrar will ask the registrant to produce an envelope bearing a postmark more than 90 days old, a lease which shows commencement of the term more than 90 days prior to the date of registration, or similar tangible proof of durational residency. This, of course, is not a fool-proof procedure, but it requires the registrar intent on fraud to do far more than just swear falsely as to his address and duration of his residency. Thus durational residency is an integral part of Louisiana's statutory scheme for deterring persons of one state, parish, municipality, or precinct from voting in another locale where they do not reside and have no cogent interest in the outcome of electoral politics. The underlying assumption is that no candidate will be able to induce migration or encampment for the purpose of fraudulent voting if the fraudulent voters are required to remain in the false locale for 3, 4, 6, or 12 months in order to pull the lever on election day.

I am convinced, then, that a properly administered, durational residency requirement—consistent with other state election laws—would be a constitutional means of promoting a state's compelling interest in a fraud-free election process. And—much as in the case of age minimums, see Oregon v. Mitchell, *supra,*— it is clear that it is inconsistent with the state's right to *some* durational residency requirement to force it to justify the specific duration it has selected. No particular duration could ever be sustained as *the* length of time necessary to deter fraudulent migration. I therefore be-

---

7. In other words, unlike the age minimum, in my opinion the state cannot demonstrate a compelling interest in *any* durational residency requirement if the state's interest is insuring an informed electorate. Even the prospective voter who arrives in the state a week before election day can inform himself adequately in this age of the mass media. I believe that the state does have a compelling interest in *some* minimum age requirement. See page 154, *supra.* And, for reasons which follow, I also believe that the state has a compelling interest in *some* uniform durational residency requirement, though none of any particular duration, if the state's interest is insuring the integrity of its election process.

lieve that a state has the right to establish a uniform durational residency requirement as a means of deterring fraudulent migration, and for that reason alone. I also believe that, for the reasons stated by Mr. Justice Stewart in Oregon v. Mitchell, we cannot acknowledge that right with one hand and then take it away with the other by requiring the state to justify the specific duration it has selected.

But I do not see any reason in logic or policy why it serves a compelling state interest to establish *differential* residency requirement of the kind Louisiana has established here. To sustain those differential requirements, we would have to conclude that where as six months is sufficient to deter fraudulent voting migration from parish to parish, one year is needed to deter a would-be fraudulent voter from temporarily moving to Louisiana from out of state. If anything, it would seem to me that *less* time of residency would be necessary to deter a fraudulent move the greater the distance of the move would likely be. If I had a mind to do so, six months would hardly deter me from taking up residence in the parish next to mine; but were I a resident of Texas I would be hesitant to come to Louisiana to cast a fraudulent vote if I had to set up housekeeping for more than a month. In any event, the state has offered no justification at all for the differential duration of residency which it imposes, and I would therefore strike down all but the least of the durational requirements—90 days—and allow it to stand across the board. Since the plaintiffs here lack standing to challenge the four-month requirement, it would formally remain on the books pending attack by suitably disfranchised plaintiff. But I would hold that these plaintiffs cannot constitutionally be subjected to the one year and six month requirements of which they complain.

There is another respect in which Louisiana's durational residency requirement cannot withstand the close scrutiny of the compelling interest test. Indeed, I seriously doubt that the law's total disfranchisement of the newcomer in his new locale bears any rational relation to a valid state purpose. When a citizen moves from Shreveport, in Caddo Parish, to New Orleans, in Orleans Parish, he cannot vote in any state election in New Orleans. He may return to Shreveport—a distance of 320 miles by car, according to the Louisiana Almanac—to vote there in statewide elections; of course there is no conceivable reason from preventing a Louisiana citizen from voting for Governor of his state simply because he moves from one end of his state to the other. Because the citizen may continue to vote in Shreveport, the state tells us that there is no disfranchisement inherent in the citizen's move to New Orleans. But I think it would take a real patriot to make the journey from New Orleans to Shreveport for the sake of a thirty second stint in a voting booth. In any event I do not think that the right to vote in statewide elections can be conditioned, even temporarily, on a voter's willingness to endure such a trip. At the very least, those plaintiffs who have resided in Louisiana for more than a year should be permitted to vote for statewide officials in their new place of residence within the state.

III. *Six Month Waiting Period Is Unconstitutional.*

Finally, I disagree with the court's cavalier, one paragraph treatment of the Louisiana statute which requires a six month waiting period before a newly declared party member may vote in that party's primary. Here, too, the compelling interest test should apply since what is at stake is a selective distribution of the franchise. In this instance, the state discriminates between independents who may affiliate and vote in a party primary with no delay; and previous registrants of another party, who must wait for six months. It has been argued that this discrimination provides a measure of protection against conniving Republicans who would like to see to it that the weakest of several Democrats primary candidates enters the general election—and vice versa. But if this cause should

ever be tried, it would surprise no one if testimony showed that the practical effect was to benefit the dominant party by imposing a high barrier to change of registration. Even assuming that preventing this practice is a compelling state interest the six month waiting period is an unconstitutionally imprecise means of accomplishing the state's objective.

The waiting period is not well suited to keep malicious cross registrants out because, if they are truly bent on conquest, they need only plan ahead. A member of one party who wishes to vote for the weakest of the other party's primary candidates may still, even in Louisiana, change his party affiliation six months in advance of the primary and cast his subversive vote. Louisiana's waiting period may *tend* to discourage fraudulent behavior since few voters are foresighted enough to conceive their scheme before election time. But the compelling interest test cannot be satisfied by the simple showing that a statutory scheme is conducive to an important state interest. The statute must provide strong assurance both that the discrimination it encompasses is necessary to accomplish the state's important purpose and that the statute does in fact accomplish that purpose. Here, the state has offered no evidence to demonstrate that the six month waiting period is any more than a rough, easily circumvented device which may reduce badly motivated crossovers, but only at the expense of the right to vote of countless other well-meaning citizens.

The concurring judge emphasizes the dereliction of these plaintiffs in failing to think far enough ahead to make a timely change of party affiliation. In my view, precisely because even well-educated, concerned citizens like these plaintiffs do *not* plan far enough ahead, there is another, even stronger reason for applying the compelling interest standard of Equal Protection review to the Louisiana waiting period. More than six months before an election, revealing and informative press literature has hardly begun to focus on the prospective candidates. The limitations of campaign finance require the candidates themselves to conserve their own publicity money until the latter stages of the race. In this relative informational vacuum, only the rare voter abandons one party and joins another, because only the rare voter is of an ideological mind to reject the program of one party and embrace that of another without waiting to see who comes forward to vie for the parties' nominations. Indeed, in Louisiana a party member will not even know for sure who the candidates of the parties will be until long after he must decide which party primary he wishes to participate in.[8]

Louisiana's waiting period thus has the practical effect of locking in party members if they should decide that they prefer the candidates of another political

8. La.Rev.Stat. 18 § 299 requires the state central committee of any political party, as that term is defined in Rev.Stat. 18 § 283, to meet and issue a call for a primary election to nominate candidates for governor or other state officers "on the first Saturday in August next preceding the date of the general state election" for those positions. The date of the primary is fixed by § 299 as the first Saturday of November following the meeting of the state central committee.

La.Rev.Stat. 18 § 309 requires that any person wishing to become a candidate in a state primary election shall file written notification of his intention not later than the seventh day after the issuance of the central committee's call for a primary election. Putting this filing date together with § 299, one readily deduces that candidacy need not be declared until approximately one week short of three months before the first party primary. At the same time, under the "waiting period" which these plaintiffs attack, a registrant must declare his desire to change his party affiliation six months before the November first primary if he wishes to vote in that election. This means that he must decide which party he will adhere to some three months before he discovers with certainty the identity of the various candidates.

party. This effect can be characterized as promoting the "stability" of political parties. But our Constitution, happily, is more solicitous of the voter's right to cast his ballot for whomever he pleases than of the uncertain advantages to be gleaned from well-managed, well-structured political parties. It requires legislation which impairs a voter's right to vote for the candidate of his choice to be tested by the stringent compelling interest standard when other voters preserve their freedom to select their preferred candidate, as independent voters do in Louisiana. The compelling interest test is appropriate because the discrimination is a telling deterrent to the First Amendment freedom to associate with others for the advancement of political beliefs. Williams v. Rhodes, 1968, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24.

I respectfully dissent.